# EXHIBIT P

1

2          **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
3          **OAKLAND DIVISION**

4    TECHNOLOGY PROPERTIES LIMITED          )
5    LLC and MCM Portfolio LLC,             )
                                            )
6          Plaintiffs,                      )     Case Number: C 14-03640-CW
                                            )
7          vs.                              )     Hon. Judge Claudia Wilken
                                            )
8    CANON, INC., et al.,                   )
                                            )
9          Defendant(s).                    )
                                            )
10   ─────────────────────────────────────)
     TECHNOLOGY PROPERTIES LIMITED          )
11   LLC and MCM Portfolio LLC,             )
                                            )     Case Number: C 14-03641-CW
12         Plaintiffs,                      )
                                            )     Hon. Judge Claudia Wilken
13         vs.                              )
                                            )
14   FALCON COMPUTER SYSTEMS, INC.,         )
15                                          )
           Defendant(s).                    )
16                                          )
17   ─────────────────────────────────────)
     TECHNOLOGY PROPERTIES LIMITED          )
     LLC and MCM Portfolio LLC,             )
18                                          )     Case Number: C 14-03642-CW
           Plaintiffs,                      )
19                                          )     Hon. Judge Claudia Wilken
           vs.                              )
20                                          )
21   HITI DIGITAL AMERICA INC.,             )
                                            )
22         Defendant(s).                    )
                                            )
23   ─────────────────────────────────────)
     TECHNOLOGY PROPERTIES LIMITED          )
24   LLC and MCM Portfolio LLC,             )
                                            )     Case Number: C 14-03643-CW
25         Plaintiffs,                      )
                                            )     Hon. Judge Claudia Wilken
26         vs.                              )
                                            )
27   HEWLETT-PACKARD COMPANY,               )
28   ─────────────────────────────────────)

1

| | |
|---|---|
| Defendant(s). | ) |
| | ) |
| TECHNOLOGY PROPERTIES LIMITED | ) |
| LLC and MCM Portfolio LLC, | ) |
| | ) |
|     Plaintiffs, | ) Case Number: C 14-03644-CW |
| | ) |
|     vs. | ) Hon. Judge Claudia Wilken |
| | ) |
| KINGSTON TECHNOLOGY CO., INC., | ) |
| | ) |
|     Defendant(s). | ) |
| | ) |
| TECHNOLOGY PROPERTIES LIMITED | ) |
| LLC and MCM Portfolio LLC, | ) |
| | ) Case Number: C 14-03645-CW |
|     Plaintiffs, | ) |
| | ) Hon. Judge Claudia Wilken |
|     vs. | ) |
| | ) |
| NEWEGG INC., et al., | ) |
| | ) |
|     Defendant(s). | ) |
| | ) |
| TECHNOLOGY PROPERTIES LIMITED | ) |
| LLC and MCM Portfolio LLC, | ) |
| | ) Case Number: C 14-03646-CW |
|     Plaintiffs, | ) |
| | ) Hon. Judge Claudia Wilken |
|     vs. | ) |
| | ) |
| SEIKO EPSON CORPORATION, et al., | ) |
| | ) |
|     Defendant(s). | ) |
| | ) |
| TECHNOLOGY PROPERTIES LIMITED | ) |
| LLC and MCM Portfolio LLC, | ) |
| | ) Case Number: C 14-03647-CW |
|     Plaintiffs, | ) |
| | ) Hon. Judge Claudia Wilken |
|     vs. | ) |
| | ) |
| SHUTTLE COMPUTER GROUP INC., | ) |
| | ) |
|     Defendant(s). | ) |
| | ) |
| TECHNOLOGY PROPERTIES LIMITED | ) |

2

LLC and MCM PORTFOLIO LLC )

           Plaintiffs,

v.

SONY CORPORATION, et al.,

           Defendants.

) Case Number: C 14-04616-CW

) Hon. Judge Claudia Wilken

**DECLARATION OF DALE E. BUSCAINO**
**IN SUPPORT OF TPL'S AND MCM'S OPENING CLAIM CONSTRUCTION BRIEF**

I, Dale Buscaino, declare as follows:

1.     I have over twenty five years of experience as an engineer, executive and consultant in the personal computer industry. A copy of my curriculum vitae is attached to this declaration as Exhibit 1.

2.     In 1982, I obtained a Bachelor of Science degree in Computer Science from the University of California at Irvine in 1982.

3.     From 1980 to 1984, I was Partner at Progressive Software Design, which provided consulting services for companies developing TRS-80 and IBM PC-based computer products. I was the co-developer of the Electric Pencil word processing program for the IBM PC. Electric Pencil was one of the first commercially available word processor programs available on the IBM PC and was sold in the retail market until 1986.

4.     From 1984 to 1992, I was the Co-Founder and Vice President of Engineering for Quadtel Corporation. I designed and developed the company's initial BIOS products. BIOS (Basic Input/Output System) is firmware installed on a personal computer which interfaces with each peripheral connected to a computer (e.g., keyboard, monitor, external drives). While at Quadtel, I was also involved in several driver projects involving SCSI drives, along with multiple firmware projects relating to single chip microcontrollers.

3

5.      In 1992, I became the Vice President of Research and Development for Phoenix Technologies, the leading BIOS supplier for IBM compatible personal computers. In the 1992 time frame, the addition of peripherals and devices to a personal computer was difficult and time-consuming. Several companies, including Phoenix, Intel, Microsoft, and Compaq Computer Corporation, began an initiative to simplify the addition of peripherals to a personal computer. I was integrally involved in that initiative and ultimately architected the specification for "Plug and Play" BIOS, which is now the de facto standard for the personal computer industry.

6.      From 1992 through 1994, I was responsible for initiating and developing the Phoenix PCMCIA Software products. PCMCIA cards are roughly the size of a credit card and can be used to expand the capabilities of a computer system. PCMCIA cards were typically used as IDE/ATA or Flash storage devices, or as a peripheral such as a modem or network adapter. The PCMCIA card is inserted into a PCMCIA connector typically found in notebook computers.

7.      As part of my responsibilities at Phoenix Technologies, I became involved with the AT Attachment Packet Interface (ATAPI) committee, which was an American National Standards Institute (ANSI) committee formed to develop a new IDE/ATA standard, which supported a PC design that included an internal CD-ROM drive that would communicate with a host computer through an IDE interface. My participation was on behalf of the BIOS community to make sure that the compatibility concerns of system manufacturers were addressed in the new specification.

8.      From 1994 through 1998, I was the Co-Founder and Vice President of Engineering at Futuretouch Corporation ("Futuretouch"). Futuretouch was primarily engaged in software development and marketing in the internet computing industry, as well as providing consulting services to companies in the PC industry.

9.      From 1998 to the present, I have provided independent consulting services to the

4

computing industry as well as expert witness services to the legal community.

10.    Through the years, I have participated in various speaking engagements, technology roundtables or symposia and industry standards working groups. For example, I participated in an executive roundtable entitled "The Impact of PCMCIA by 1996," whose proceedings are recorded in the Sept/Oct '94 issue of IC Card Systems & Design.

11.    In forming my opinions, I rely on my knowledge and experience noted above. I also rely on the documents and information referenced and cited in this declaration including any exhibits thereto.

## I.    SUMMARY OF OPINIONS

12.    I have been asked by Technology Properties Limited, LLC ("TPL") and MCM Portfolio LLC ("MCM") to provide my opinion on Defendants' contention that certain terms or phrases of U.S. Patent Nos. 7,522,424 ("the '424 patent") and/or U.S. Patent No. 7,719,847 ("the '847 patent") are definite.

13.    In my opinion, the following claim terms and phrases of the '424 and '847 patent claims are definite:

- "means for mapping power, ground or data signals between said interconnection pins and said one or more contact pins depending upon the identification of the type of memory card inserted into said port ('424 patent, claim 25)

- "means for mapping, power, ground or data signals between said interconnection means and said one or more contact pins depending upon the identification of the type of memory card inserted into said port" ('424 patent, claim 28)

- "means for mapping power, ground or data signals between said signal lines and said contact pins depending upon the identification of the type of memory card inserted into said port" ('847 patent, claim 1)

- "said controller" ('847 patent, claim 2)

## II.    MATERIALS REVIEWED

14.     In forming my opinions contained in this Declaration, I have reviewed U.S. Patent Nos. 7,522,424 ("the '424 patent") and U.S. Patent Nos. 7,719,847 ("the '847 patent"), the file histories for the patents, and the Defendants' proposed constructions and indefiniteness contentions that are set forth in Exhibit B to the Joint Claim Construction and Pre-Hearing Statement filed in the Eastern District of Texas in *Technology Properties Limited LLC et al. v. Canon, Inc. et al.,* Case No. 6:12-cv-202-MHS, Doc. 154 (E.D. Tex.)

## I.     LEGAL STANDARDS

15.     I have been informed by Plaintiffs' counsel of the following legal standards. In rendering my opinion, I have applied these legal standards.

### A.     Claim Construction

a.     The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art.

b.     The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.

c.     The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

d.     Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person

6

of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

e.      Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

**B.      Person of Ordinary Skill**

a.      Factors that may be considered in determining the level of skill include: the type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.

**C.      Indefiniteness**

a.      35 U.S.C. § 112, paragraph 2, provides: The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

b.      A patent is invalid for indefiniteness under 35 U.S.C. § 112, paragraph 2 if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

c.      Definiteness is to be evaluated from the perspective of someone skilled in the relevant art.

d.      In assessing definiteness, claims are to be read in light of the patent's specification and prosecution history.

7

e.     Definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed.

f.     Section 112 entails a delicate balance.  On the one hand, the definiteness requirement must take into account the inherent limitations of language.  Some modicum of uncertainty is the price of ensuring the appropriate incentives for innovation.  One must bear in mind, moreover, that patents are not addressed to lawyers, or even to the public generally, but rather to those skilled in the relevant art.

g.     A patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them.  Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.

h.     The definiteness requirement mandates clarity, while recognizing that absolute precision is unattainable. The certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.

i.     A patent which defines a claim phrase through examples may satisfy the definiteness requirement.

## II.     PERSON OF ORDINARY SKILL IN THE ART

16.     I understand that the person of ordinary skill in the art is viewed at the time of the inventions and that the '424 and '847 patents claim priority to an application filed on July 6, 2000.

17.     It is my opinion that one of ordinary skill in the art relevant to the '424 and '847 patents at the time of the invention would have been a person with a bachelor's of science in electrical or computer engineering with approximately three years of experience working with computer peripherals and/or external storage devices, or equivalent degrees or experience.

1    18.    At the time of the inventions, I was at least one of ordinary skill in the art.

2   **III.    OPINION ON DEFINITENESS OF CERTAIN TERMS**

3       **A.    '847 Patent Claim 1 and '424 Patent Claims 25 and 28**

4    19.    I understand that Defendants have asserted that the following phrases are indefinite

because each does not provide reasonable certainty as to whether "between" modifies the signals

or the structure of the means.

- "means for mapping power, ground or data signals between said interconnection pins and said one or more contact pins depending upon the identification of the type of memory card inserted into said port ('424 patent, claim 25)

- "means for mapping, power, ground or data signals between said interconnection means and said one or more contact pins depending upon the identification of the type of memory card inserted into said port" ('424 patent, claim 28)

- "means for mapping power, ground or data signals between said signal lines and said contact pins depending upon the identification of the type of memory card inserted into said port" ('847 patent, claim 1)

20.    When claims 25 and 28 of the '424 patent and claim 1 of the '847 patent, including

these phrases, are read in light of the intrinsic evidence, it would have informed, with reasonable

certainty, those skilled in the art about the scope of the claimed invention.

21.    I understand Defendants to essentially be asserting that it is not clear whether the

"means for mapping" is *located between* the following elements, or whether the "means" is "*for

mapping signals between*" the following elements.

   a.    "said interconnection pins and said one or more contact pins" ('424 patent, claim 25)

   b.    "said interconnection means and said one or more contact pins" ('424 patent ,claim 28")

   c.    "said signal lines and said contact pins" ('847 patent ,claim 1)

22.    I disagree with Defendants' assertions.

23.    As I have opined in my August 2, 2012 Declaration in Support of TPL's Response to Respondents' Opening Claim Construction Brief submitted in Investigation No. 337-TA-841 before the International Trade Commission, the "means for mapping" is a controller.  I understand that Defendants agree that "means for mapping" includes a controller.

24.    These claims, read in light of the intrinsic evidence, would have informed one of ordinary skill in the art with more than reasonble certainty that the "means for mapping," or controller, is not located between the above-elements.  Rather, these claims, read in light of the intrinsic evidence, would have informed one of ordinary skill in the art with more than reasonble certainty that the "means," or controller, is "for *mapping signals between*" the above- elements.

### i.    '847 Patent Claim 1

25.    Claim 1 of the '847 patent, read in light of the intrinsic evidence, would inform one of ordinary skill in the art with more than reasonble certaintly that the "means," or controller, is not located between "said signal lines and said contact pins."  Rather, claim 1, read in light of the intrinsic evidence, would inform one of ordinary skill in the art with more than reasonable certaintly that the "means," or controller, is for *mapping signals between* "said signal lines and said contact pins."

26.    For example, claim 1 states: "the means for mapping comprises a controller." Claim 1 further recites:  "a set of signal lines connected to a controller."  Claim 1 goes on to recite: "the signal lines located between the controller and an interconnection means."  Claim 1 then recites: "said interconnection means . . . connecting said signal lines to said one or more contact pins."  Clam 1 therefore recites the following ordering:

**controller ---- signal lines ---- interconnection means ---- contact pins.**

27.    Therefore, based on claim 1 alone, I understand with more than reasonble certainty that the "means for mapping," or controller, is not located between the signal lines and contact

pins.   Rather, based on claim 1, I understand with more than reasonable certainty that the

"means," or controller, is "*for mapping signals* between said signal lines and said contact pins."

28.     Nothing in the intrinsic evidence suggests otherwise.  The intrinsic evidence is

consistent with claim 1.

29.     For example, the '847 patent specification at column 5, line 66 to 6, line 9

discusses mapping for one embodiment in conjunction with controller chip 231.  I show an

annotated excerpt of Figure 2 below that highlights controller chip 231:



Controller chip 231 is highlighted in green.  A printed circuit board (PCB) 230 is highlighted in

yellow (see column 2, line 11).  Interconnects 212 are highlighted in blue (see column 2, line 12).

One of ordinary skill in the art would understand that Interconnects 212 can include

interconnection means or interconnection pins.  A set of contact pins 215 is highlighted in pink

(see column 2, line 14).  As one of ordinary skill in the art would understand from the above

figure, Contact pins 215 connect to the Interconnects 212, which connect to printed circuit board

230.  One of ordinary skill in the art would understand that signal lines on the printed circuit

board connect the Interconnects 212 to the controller chip 231.  Thus, claim 1, read in light of the

specification, further informs me with more than reasonable certainty the "means for mapping,"

or controller is not located between the signal lines and the contact pins.

30.     For example, page 6 of the Response to the September 21, 2009 Office Action in

the file history of the '847 patent states that "Claim 2 further requires a controller connected to a

set of signal lines, the signal lines connected to an interconnection means, and the interconnection means connected to contact pins. The controller *maps signals between* the signal lines and the contact pins." I understand that claim 2 during prosecution issued as claim 1. Claim 1, read in light of this statement, further informs me with more than reasonble certainty, that the "means for mapping," or contoller, is not located between the signal lines and contact pins. Rather, claim 1, read in light of this statement, further informs me with more than reasonable certainty, that the "means for mapping," or controller, is for *mapping signals between* the signal lines and contact pins.

31.     The September 21, 2009 Office Action Response then goes on to state on page 7 that "[i]n the figures, the connector pins 1-21 (Fig. 4) and 1-18 (Fig. 5) correspond to the signal lines connected to the controller, and the interconnection means connect these signal lines (connector pins) to the contact pins of the respective cards." This is the same order of connection shown above. Thus, claim 1, read in light of this statement, further informs me with more than reasonble certainty that the "means for mapping," or contoller, is not located between the signal lines and contact pins. Rather, claim 1, read in light of this statement, further informs me with more than reasonable certainty that the "means for mapping," or controller, is *for mapping signals between* the signal lines and contact pins.

### ii.     '424 Patent Claim 25 and 28

32.     Claims 25 and 28 of the '424 patent, read in light of the intrinsic evidence, would inform one of ordinary skill in the art with more than reasonble certaintly that the "means," or controller, is not located between "said interconnection [pins/means] and said one or more contact pins." Rather, claims 25 and 28, read in light of the intrinsic evidence, would inform one of ordinary skill in the art with more than reasonable certaintly that the "means," or controller, is for *mapping signals between* "said interconnection [pins/means] and said one or more contact pins."

33.     As discussed, the "means for mapping" is a controller.

34.     Similar to claim 1 of the '847 patent, claims 25 and 28 of the '424 patent recite "contact pins," "interconnection [pins/means]," "signal lines connected to [said interconnection pins/an interconnection means]." Dependent claims 26 and 29 even recite that the "means for mapping comprises a controller."

35.     I understand claims 25 and 28, read in light of the intrinsic evidence, to require the same order of connection discussed above:

**controller ---- signal lines ----  interconnection means/pins ---- contact pins.**

36.     Therefore, I understand with more than reasonble certainty that the "means for mapping," or controller, is not located between said interconnection means/pins and said or more contact pins.  Rather, I understand with more than reasonable certainty that the "means," or controller, is "*for mapping signals between* said interconnection [pins/means] and said one or more contact pins."

37.     Nothing in the intrinsic evidence suggests otherwise.  The intrinsic evidence is consistent with claims 25 and 28.

38.     For example, the '424 patent specification at column 6, lines 12-22 discusses mapping for one embodiment in conjunction with controller chip 231.  I show an annotated excerpt of Figure 2 below that highlights controller chip 231:



13

Controller chip 231 is highlighted in green. A printed circuit board (PCB) 230 is highlighted in yellow (see column 2, line 24). Interconnects 212 are highlighted in blue (see column 2, line 25). One of ordinary skill in the art would understand that Interconnects 212 can include interconnection means or interconnection pins. A set of contact pins 215 is highlighted in pink (see column 2, line 27). As one of ordinary skill in the art would understand from the above figure, Contact pins 215 connect to the Interconnects 212, which connect to printed circuit board 230. One of ordinary skill in the art would understand that signal lines on the printed circuit board connect the Interconnects 212 to the controller chip 231. Thus, claims 25 and 28, read in light of the specification, further inform me with more than reasonable certainty the "means for mapping," or controller is not located between said intereconnection [pins/means] and said one or more contact pins.

39. I understand that the '424 patent derives from the same parent patent application as the '847 patent. Page 6 of the Response to the September 21, 2009 Office Action in the file history of the related '847 patent states "a controller [is] connected to a set of signal lines, the signal lines connected to an interconnection means, and the interconnection means connected to contact pins. The controller *maps signals between* the signal lines and the contact pins." Claims 25 and 28 of the '424 patent, read in light of this statement, further inform me with more than reasonble certainty, that the "means for mapping," or contoller, is not located between the interconnection pins/means and the one or more contact pins. Rather, claims 25 and 28, read in light of this statement, further inform me with more than reasonable certainty, that the "means for mapping," or controller, is for *mapping signals between* said interconnection pins/means and said one or more contact pins.

40. The Sepetember 21, 2009 Office Action Response goes on to state on page 7, "[i]n the figures, the connector pins 1-21 (Fig. 4) and 1-18 (Fig. 5) correspond to the signal lines

14

connected to the controller, and the interconnection means connect these signal lines (connector pins) to the contact pins of the respective cards." This is the same order of connection shown above. Thus, claims 25 and 28, read in light of this statement, futher inform me with more than reasonble certainty that the "means for mapping," or contoller, is not located between the interconnection pins/means and the one or more contact pins. Rather, claims 25 and 28, read in light of this statement, inform me with more than reasonable certainty that the "means for mapping," or controller, is for *mapping signals between* the interconnection pins/means and the one or more contact pins.

41.    I also note that Figures 4 and 5 are discussed in relation to these statements on pages 6 and 7 of the Response to the September 21, 2009 Office Action.  Based on the '847 and '424 patents' disclosures, I understand that Figures 4 and 5 illustrate embodiments of claim 1 of the '847 patent and claims 25 and 28 of the '424 patent.  Therefore, claims 25 and 28 of '424 patent (read in light of these statements, Figure 4 and  Figure 5, and the '424 patent specification's discussion of Figure 4's and Figure 5's embodiments) futher inform me with more than reasonble certainty that the "means for mapping," or contoller, is not located between the interconnection pins/means and the one or more contact pins.  Rather, claims 25 and 28, read in light of these statements, inform me with more than reasonable certainty that the "means for mapping," or controller, is for *mapping signals between* the interconnection pins/means and the one or more contact pins.

**B.**    **'847 Patent Claim 2**

42.    I understand that Defendants have asserted that the term "said controller" in claim 2 of the '847 patent is indefinite.

43.    I also understand that certain Defendants asserted in International Trade Commission Investigationn No. 337-TA-841 that claim 1 of the '847 patent requires two

1    controllers.

2        44.    To the extent that Defendants are basing their indefiniteness contention on an

3    argument that one of ordinary skill in the art would not understand, with reasonable certainty,

4    whether "said controller" of claim 2, read in light of the intrinsic evidence, refers to a first

5    controller or a second controller in claim 1, I disagree with Defendants' indefiniteness contention.

6

7        45.    I understand with reasonable certainty that claim 1, read in light of the intrinsic

8    evidence, does not claim two controllers.  I understand with reasonable certainty that claim 1,

9    read in light of the intrinsic evidence, claims an apparatus with one controller.  Therefore, I

10   understand that "said controller" in claim 2, read in light of the intrinsic evidence, refers to the

11   one and only controller of claim 1.

12

13       46.    There is no discussion in the '847 patent claims, the specification, or the

14   prosecution history of a dual-controller system.  Only single-controller embodiments are

15   disclosed.

16       47.    I understand, with reasonble certainty, from claim 1 alone that two controllers are

17   not part of the claimed apparatus.  Claim 1 is structured to support only one controller.  Claim 1

18   recites "a set of signal lines connected to a controller."  It also states that "signals lines are located

19   between the controller and an interconnection means . . . connecting said signals lines to said one

20   or more contact pins."   Based on claim 1, I understand the requisite order of structure to be that

21
22   shown below.

23            **controller ---- signal lines ----  interconnection means/pins ---- contact pins**

24       48.    In my opinion, one of ordinary skill in the art would not read claim 1, alone or in

25   light of the intrinsic evidence, and believe that there might be two controllers.  One of ordinary

26   skill in the art would understand, based on the claims and the intrinsic evidence, that the purpose

27   of the controller is to map signals between said signal lines and said contact pins, as claimed.

28

16

One of ordinary skill in the art would understand that if a controller is connected to the signal lines, as claimed, ("a set of signal lines connected to a controller"), the same controller would be used "for mapping power, ground or data signals between the signal lines and said contact pins." There would be no purpose or place for a second controller in the apparatus of claim 1.

49.     Further, page 6 of the Response to the September 21, 2009 Office Action in the file history of the '847 patent states that "Claim 2 further requires **a controller connected to a set of signal lines**, the signal lines connected to an interconnection means, and the interconnection means connected to contact pins. **The controller maps signals between** the signal lines and the contact pins." I understand that claim 2 during prosecution issued as claim 1. Claim 1, read in light of this statement, further informs me with more than reasonble certainty, that there are not two controllers in claim 1. The controller that is connected to a set of signal lines, ("a controller connected to a set of signal lines"), is the same controller that performs the "mapping" ("means for mapping . . . wherein the means for mapping comprises a controller").

I declare that the foregoing is true and correct to the best of my knowledge and belief and that it is a true and accurate copy of my Declaration.

DATED: January 29, 2015

Dale E. Buscaino

17

# EXHIBIT 1

4775 Green Crest Dr          Phone: 714-328-0616
Yorba Linda, CA 92887        E-mail: dale@buscaino.net

# Dale Buscaino

## PROFESSIONAL EXPERIENCE

**1998 to present**     **Independent Consulting Services**

Provides consulting services to the computing industry including expert witness services for the legal community.

**1994 to 1998**       **FUTURETOUCH CORPORATION**
**Co-Founder and Vice President, Engineering**

This internet-focused company has developed a WYSIWYG JAVA design tool for creating web sites on-line. Responsibilities included development of Windows NT server software, designed to handle requests from the JAVA designer client. Previous responsibilities included software development, technical sales and marketing for a line of multimedia personal computer products.

**1992 to 1994**       **PHOENIX TECHNOLOGIES**
**Vice President, Research and Development**

Responsible for product development strategies for the company's Personal Computer Division. Conceived separate product strategies for Plug and Play BIOS and PCMCIA software. In addition, initiated and developed the Phoenix PCMCIA software product line. Also served as key technical liaison with major computer manufacturers, including Toshiba, Fujitsu, DEC, IBM, and Hewlett Packard.

**1984 to 1992**       **QUADTEL CORPORATION**
**Co-Founder and Vice President, Engineering**

Designed and developed the company's initial firmware products, including XT BIOS, AT BIOS, EGA/VGA BIOS, power management and keyboard firmware. Responsibilities included maintaining technical relationships with core-logic vendors such as Intel, VLSI, Headland Technologies, and Chips and Technologies. Also served as technical interface with key customers, including Canon, Fujitsu, Sanyo, and Seiko Epson.

**1980 to 1984**          **PROGRESSIVE SOFTWARE DESIGN**
                         **Partner**

                         Progressive Software Design provided consulting services for
                         companies developing TRS-80 based computer products. Also
                         collaborated in development of the company's Electric Pencil word
                         processing program, a product for the IBM PC, which was sold in the
                         retail market until 1986.

## EDUCATION

BS, computer science, University of California, Irvine, 1982

## PUBLICATIONS

Co-author of the industry standard Plug and Play BIOS specification developed by
Phoenix Technologies, Intel Corporation and Compaq Corporation, 1993.

## LITIGATION CASE HISTORY

Compaq v. Packard Bell, 1996. Retained by Wilson, Sonsini, Goodrich, & Rosoti.

Oak Technologies v. UMC, et al. (ITC), 1998. Retained by Wilson, Sonsini, Goodrich &
Rosoti.

Ethan Shaw et al. v. Toshiba (TAIS), 1999, Retained by Fulbright & Jaworski.

Anthony Coppola v. American Power Conversion (APC), 2000, Retained by Mintz, Levin,
Cohen, Ferris, Glovsky, and Popeo PC.

Compaq v. eMachines, 2000–2002, Retained by Fulbright & Jaworski and Fish & Richardson,
P.C., P.A.

Zoran Corporation v. MediaTek, Inc., et al., 2004-2005, Retained by Wilson, Sonsini, Goodrich
& Rosati.

Hewlett Packard v. Gateway, Inc. 2004 -2005, Retained by Dewey Ballantine, LLP.

Oak Technologies v. UMC, Inc. 2002 – 2006, Retained by Wilson, Sonsini, Goodrich & Rosati
on behalf of Defendant.

Samsung Electronics Co., Ltd v. Compal. 2001-2006 , Retained by Orrick, Herrington &
Sutcliffe LLP on behalf of Defendant.

Lucent Technologies, Inc. v. Gateway, Inc., Dell Inc., and Microsoft Corp. 2006 - 2008 . Retained by Dechert LLP, Arnold & Porter LLP, and Fish and Richardson P.C on behalf of Defendants.

Microsoft Corp. v. Lucent Technologies Inc., Alcatel-Lucent, and Multimedia Patent Trust. 2007 - 2008, Retained by Fish and Richardson P.C on behalf of Plaintiff.

Technology Properties Limited LLC. (TPL) v. Sony Corporation, Transcend Information, Inc., Pandigital, 2012.  Retained by Agility IP Law, LLC on behalf of Complainant.

Technology Properties Limited LLC. (TPL) v. Acer Inc., Brother Industries, Ltd., Canon Inc., Dell Inc., Hewlett-Packard Company, HiTi Digital, Inc., Kingston Techonology Co., Inc, Newegg Inc., Seiko Epson Corp.,  2012-2013.  Retained by The Simon Law Firm, P.C. on behalf of Complainant.