Megan Rae Whyman Olesek (Bar No. 191218)
KENYON & KENYON LLP
1801 Page Mill Road, Suite 120
Palo Alto, CA 94304-1216
Telephone: (650) 384-4701
Facsimile: (650) 384-4701
Email: molesek@kenyon.com

T. Cy Walker (admitted Pro Hac Vice)
KENYON & KENYON LLP
1500 K Street, NW, Suite 700
Washington, DC 20005
Telephone: 202-220-4200
Facsimile: 202-220-4201
Email: cwalker@kenyon.com

Marcia H. Sundeen (admitted Pro Hac Vice)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
Email: msundeen@goodwinprocter.com
*ATTORNEYS FOR DEFENDANTS*
*HEWLETT-PACKARD COMPANY.*

**ADDITIONAL PARTIES LISTED**
**ON SIGNATURE PAGES**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| TECHNOLOGY PROPERTIES LIMITED LLC, et al., <br><br>     Plaintiffs, <br><br>     v. <br><br><br><br> HEWLETT-PACKARD COMPANY, <br>     Defendant. | Civil Action No. 4:14-cv-03643-CW <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Date:  June 18, 2015 <br> Time  2:00 pm <br> Place: Courtroom 2 – 4th Floor <br> Judge: Hon. Claudia Wilken |

| | |
|---|---|
| TECHNOLOGY PROPERTIES LIMITED LLC and MCM PORTFOLIO LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CANON INC., et al.,<br><br>                    Defendants. | Civil Action No. 14-03640 CW<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:  June 18, 2015<br>Time   2:00 pm<br>Place: Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |
| TECHNOLOGY PROPERTIES LIMITED LLC, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br><br><br>NEWEGG INC. et al.,<br><br>                    Defendants. | Civil Action No. 4:14-cv-03645-CW<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:  June 18, 2015<br>Time   2:00 pm<br>Place: Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |
| TECHNOLOGY PROPERTIES LIMITED LLC and MCM PORTFOLIO LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SEIKO EPSON CORPORATION, et al.,<br><br>                    Defendants. | Civil Action No. 14-03646 CW<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:  June 18, 2015<br>Time   2:00 pm<br>Place: Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on June 18, 2015, at 2:00pm, or as soon thereafter as counsel may be heard before the Honorable Claudia Wilken in Courtroom 2 of the above-entitled Court, located at 1301 Clay St., Oakland, CA 94612, Defendants Hewlett-Packard Company, Canon Inc., Canon U.S.A., Inc., Newegg Inc, Rosewill Inc., Seiko Epson Corporation, and Epson America, Inc. (collectively "Defendants") will and hereby move this Court, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings with respect to Technology Properties Limited's and MCM Portfolio LLC's ("TPL" or "Plaintiffs") pending causes of action (Counts I-III). This motion is made on the following ground: Plaintiffs' pending causes of action are barred by the *Kessler* doctrine because the U.S. International Trade Commission ("the ITC") found that Defendants did not infringe U.S. Patent Nos. 7,295,443, 7,522,424 and 7,719,847 (the "patents-in-suit"), and Plaintiffs chose not to appeal the decision to the Federal Circuit.

This Motion is based on this Notice, the attached Memorandum of Points and Authorities, the pleadings and papers on file in this action or deemed to be on file at the time this Motion is heard, other such evidence and argument as may be presented in connection with the hearing of this Motion, and all matters of which this Court may take judicial notice.


DATED: May 1, 2015                     GOODWIN PROCTER LLP
                                       By */s/Marcia H. Sundeen*
                                          Marcia H. Sundeen
                                          Attorney for Defendant Hewlett-Packard
                                          Company

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................4

STATEMENT OF ISSUE TO BE DECIDED....................................................................................5

STATEMENT OF FACTS ...........................................................................................................5

    A.    TPL's Complaint in the ITC .....................................................................................5

    B.    TPL's Complaint in This Action................................................................................6

    C.    The ITC Decision......................................................................................................6

ARGUMENT.............................................................................................................................7

I.      LEGAL STANDARD.......................................................................................................7

II.    THE *KESSLER* DOCTRINE BARS TPL FROM RE-LITIGATING WHETHER DEFENDANTS' PRODUCTS INFRINGE THE PATENTS-IN-SUIT .................................7

    A.    The *Kessler* Doctrine Prevents a Plaintiff from Relitigating a Finding of Non-Infringement.............................................................................................................8

    B.    The *Kessler* Doctrine Bars TPL's Infringement Claims.............................................9

    C.    TPL Cannot Evade the Binding Effect of an ITC Finding of Non-Infringement by Choosing Not to Appeal............................................................................................11

CONCLUSION........................................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackermann v. United States*,
340 U.S. 193 (1950).................................................................................................. 12

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
No. 13-352, slip op., 575 U.S. __ (2015)..................................................................... 9

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
80F.3d 1553, 1563 (Fed. Cir. 1996)..................................................................... 10, 12

*Brain Life, LLC v. Elekta Inc.*,
746 F.3d 1045 (Fed. Cir. 2014)...........................................................................*passim*

*Certain Computers and Computer Peripheral Devices, and Components Thereof,
and Products Containing the Same*,
Inv. No. 337-TA-841 .................................................................................................. 6

*EFCO Corp. v. U.W. Marx, Inc.*,
124 F.3d 394 (2d Cir. 1997)..................................................................................... 12

*Federated Dep't Stores, Inc. v. Moitie*,
452 U.S. 394 (1981)................................................................................................. 12

*Function Media, L.L.C. v. Kappos*,
508 F. App'x 953 (Fed. Cir. 2013) ........................................................................... 12

*Harris v. County of Orange*,
682 F.3d 1126 (9th Cir. 2012) .................................................................................. 7

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) .................................................................................... 7

*Kessler v. Eldred*,
206 U.S. 285 (1907)..........................................................................................*passim*

*LSI Corp. et al. v. U.S. International Trade Commission*,
No. 14-1410 (Fed. Cir. Mar. 20, 2015).................................................................... 10

*Lyon v. Chase Bank USA, NA*,
656 F.3d 877 (9th Cir. 2011) .................................................................................... 7

*McLellan v. Perry*,
No. 3:12-CV-00391-MMD, 2014 WL 1309291 (D. Nev. Mar. 27, 2014).................. 12

*MGA, Inc. v. General Motors Corp.*,
827 F.2d 729 (Fed. Cir. 1987).............................................................................. 9, 10

*Powertech Tech. Inc. v. Tessera, Inc.*,
    660 F.3d 1301 (Fed. Cir. 2011) ..................................................................... 10, 11, 12

*SpeedTrack, Inc. v. Office Depot, Inc.*,
    No. C 07-3602 PJH, 2014 WL 1813292 (N.D. Cal. May 6, 2014) ............................... 8, 9, 11, 13

*Tech. Prop. Ltd. LLC et al. v. Barnes & Noble, Inc.*,
    No. 12-cv-03863 (N.D. Cal. Feb. 4, 2015), ECF No. 48 .................................................. 5

*Texas Instruments v. Cypress Semiconductor Corp.*,
    90 F.3d 1558,1569 (Fed. Cir. 1996) ............................................................... 10, 11, 12

*Twelve John Does v. Dist. of Columbia*,
    841 F.2d 1133 (D.C. Cir. 1988) .................................................................................. 12

**Statutes**

28 U.S.C. § 1659 .......................................................................................................... 6

An Administrative Law ................................................................................................. 5

**Other Authorities**

(http://edis.usitc.gov) .................................................................................................. 6

Rule 12(b) ................................................................................................................... 7

Rule 12(c) ............................................................................................................... 7, 14

Rule 60(b)(6) ............................................................................................................. 12

U.S. Patent No. 7,162,549 ............................................................................................ 6

U.S. Patent Nos. 7,295,443 ........................................................................................... 5

U.S. Patent Nos. 7,295,443, 7,522,424 and 7,719,847 ................................................. 4, 5

Defendants Hewlett-Packard Company, Canon Inc., Canon U.S.A., Inc., Newegg Inc,
Rosewill Inc., Seiko Epson Corporation, and Epson America, Inc. (collectively "Defendants")
respectfully bring this motion for judgment on the pleadings to dismiss Plaintiffs' pending causes of
action – regarding alleged infringement of U.S. Patent Nos. 7,295,443, 7,522,424 and 7,719,847
(the "patents-in-suit").[1]

## PRELIMINARY STATEMENT

The day before TPL filed its complaint initiating individual district court suits against each
Defendant, TPL filed a complaint requesting the ITC to institute an investigation into the alleged
infringement of the patents-in-suit due to Defendants' importation and sale of various products,
such as printers, laptops and desktops, that allegedly include infringing memory card readers
("Defendants' products").  TPL requested that the ITC issue an exclusion order barring importation
of Defendants' products, if the ITC determined, *inter alia*, that Defendants' products infringed the
patents-in-suit.

At the outset of the individual district court suits, Defendants requested, and TPL did not
oppose, that the district court grant stays pending the outcome of the ITC investigation.  The district
court actions were stayed, the ITC investigation proceeded to trial, and TPL lost all of its
infringement claims against Defendants' products relating to the patents-in-suit.  TPL did not
appeal the final ITC judgment, but now seeks to relitigate the same claims of infringement here.
TPL should not be allowed a "do-over."  The ITC has already ruled that Defendants' products do
not infringe the patents-in-suit, and that finding is binding on this Court under the doctrine of
*Kessler v. Eldred*, 206 U.S. 285 (1907).

The *Kessler* doctrine instructs that a finding of non-infringement precludes relitigation even
where that finding would not be the basis for *res judicata* or collateral estoppel.  In a case just
decided last year, the Federal Circuit held that the *Kessler* doctrine is still binding precedent and
still stands for the proposition that a patentee cannot bring a second suit after a finding of non-

---

[1] Defendants provided notice to TPL on April 23, 2015, as to the substance of this motion and the
proposed hearing date of June 18, 2015.  TPL cited no scheduling conflict as to the proposed
hearing date, but rather objected generally to the motion being raised at this stage of the
proceedings.  *See* Declaration of Marcia Sundeen in Support of Defendants' Motion for Judgment
on the Pleadings ("Sundeen Decl."), ¶ 6.

infringement. Specifically, the *Kessler* Doctrine "fills the gap" in preclusion doctrines and allows "an adjudged *non-infringer* to avoid repeated harassment for continuing its business as usual post-final judgment in a patent action where circumstances justify that result." *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1056 (Fed. Cir. 2014).

A straight-forward application of the *Kessler* doctrine establishes that TPL cannot relitigate the ITC's finding of non-infringement. TPL chose to simultaneously bring actions in the ITC and in district court. The ITC has jurisdiction to resolve the question of infringement and it conducted a thorough and extensive investigation before rendering its final decision. An Administrative Law Judge (ALJ) reached a carefully reasoned opinion finding non-infringement. The full Commission considered that decision and affirmed the non-infringement determination. TPL could have appealed that decision to the Federal Circuit, but chose not to. Thus, TPL had every opportunity to prove infringement in a competent tribunal and ultimately to the appellate court that would hear an appeal in this case.

TPL should not get another chance simply because it would like to try again in another forum. The ITC proceeding is over and TPL lost. Having elected to forgo appealing the ITC's determination that Defendants' products do not infringe the patents-in-suit, the issues in the pending cases are resolved. There is no basis in law or policy for TPL to get another bite at the apple.

## STATEMENT OF ISSUE TO BE DECIDED

Does the *Kessler* doctrine bar TPL's claims for infringement of the patents-in-suit because the ITC has already found that Defendants' products do not infringe those patents, and TPL chose not to appeal that decision to the Federal Circuit?[2]

## STATEMENT OF FACTS

### A. TPL's Complaint in the ITC

On March 27, 2012, TPL filed a complaint in the ITC under Section 337, alleging infringement of, *inter alia*, the same three patents that are asserted in this action, and requesting the

---

[2] A similar motion is pending in the N.D. Cal. San Jose division in another matter involving TPL. *See* Defendant Barnes & Noble, Inc,'s Motion for Judgment on the Pleadings, *Tech. Prop. Ltd. LLC et al. v. Barnes & Noble, Inc.*, No. 12-cv-03863 (N.D. Cal. Feb. 4, 2015), ECF No. 48.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

ITC to institute an investigation. (*See* Dkt. 12, Exh. A (4:14-cv-03640) (ITC Complaint).) The three patents are U.S. Patent Nos. 7,295,443 (the '443 Patent"), 7,522,424 (the '424 Patent") and 7,719,847 (the '847 Patent"). All three of these patents relate to memory card readers, which are used in electronic devices such as laptops and printers. TPL alleged that memory card readers used in Defendants' products infringed these three patents. The ITC instituted an investigation based on TPL's allegations of infringement and the investigation proceeded.[3]

### B. TPL's Complaint in This Action

On March 28, 2012, TPL brought suit in the U.S. District Court for the Eastern District of Texas against each Defendant for alleged infringement of the same respective patents asserted in the ITC.[4] The operative allegations of infringement in each case are the same allegations set forth in TPL's ITC Complaint. *See, e.g.,* Compl. ¶¶ 5-52 (HP). TPL's Complaint alleges that memory card readers in Defendants' products infringe the patents-in-suit. *Id.* ¶¶ 14, 26, 38 and 50. The newly identified products in this Action are essentially the same as the accused products identified by TPL in the ITC matter. Pursuant to 28 U.S.C. § 1659, the Court granted mandatory stays of those cases pending the outcome of the ITC investigations based on unopposed motions. (*See, e.g.,* Dkt. 10.)

### C. The ITC Decision

The ITC investigation proceeded before Administrative Law Judge Essex. The parties engaged in extensive fact and expert discovery. Judge Essex held a *Markman* hearing in August 2012 and issued a lengthy *Markman* order in October 2012. In January 2013, Judge Essex held a four-day evidentiary hearing where the parties presented extensive fact and expert testimony. After the hearing and briefing, Judge Essex, in August 2013, ruled that Defendants' products did not infringe any of the three patents at issue in this suit. With regard to the patents-in-suit, Judge Essex

---

[3] *Certain Computers and Computer Peripheral Devices, and Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-841 (the "841 investigation"). The public version of the ITC opinion is available on the ITC's EDIS system (http://edis.usitc.gov) and is also attached as Exhibit A to the Sundeen Declaration being submitted herewith.

[4] Different combinations of patents were asserted against various Defendants, but each of the patents asserted in the currently-pending actions was also asserted against the same Defendants in the ITC action.

-6-                                              Case No. 4:14-cv-03643-CW
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

found that the memory card readers in Defendants' products did not satisfy the "mapping" limitations required by all asserted claims. TPL petitioned the Commission for review and reversal of Judge Essex's conclusions. The Commission granted review and, after additional briefing, issued an opinion affirming the ALJ's decision of non-infringement.

TPL could have appealed to the Federal Circuit, but chose not to do so, thus rendering the ITC judgment of non-infringement final. Instead, TPL moved to lift the stays in the Eastern District of Texas actions in an attempt to litigate anew the issues it lost at the ITC. After lifting the stays and consolidating the cases for pretrial purposes, the Texas Court transferred the cases to this Court on August 12, 2014.

## ARGUMENT

### I. LEGAL STANDARD

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." *Lyon v. Chase Bank USA, NA*, 656 F.3d 877, 883 (9th Cir. 2011) (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)). A motion under Rule 12(c) is "functionally identical" to a motion to dismiss under Rule 12(b). *Id.* (quoting *Dworkin*, 867 F.2d at 1192). Thus, for a Rule 12(c) motion, "[t]he Court inquires whether the complaint at issue contains 'sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face.'" *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "When considering a motion for judgment on the pleadings, this court may consider facts that are contained in materials of which the court may take judicial notice." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir. 1999) (internal quotation marks omitted).

### II. THE *KESSLER* DOCTRINE BARS TPL FROM RE-LITIGATING WHETHER DEFENDANTS' PRODUCTS INFRINGE THE PATENTS-IN-SUIT

Because TPL brought suit in the ITC, and the ITC held that Defendants' products do not infringe the patents-in-suit, TPL cannot relitigate that holding now. This case falls squarely within the *Kessler* doctrine, which bars relitigation of failed patent claims even where the case does not fit precisely within the scope of *res judicata* or collateral estoppel.

## A. The *Kessler* Doctrine Prevents a Plaintiff from Relitigating a Finding of Non-Infringement

In *Kessler*, the owner of a patent related to electric lighters (Eldred) filed an infringement suit against a competing seller of lighters (Kessler). *Kessler*, 206 U.S. at 287-88. Although Kessler prevailed, Eldred then brought an infringement suit against one of Kessler's customers, who sold the same lighters that were at issue in the first action. *Id.* Kessler intervened and also brought a separate suit to enjoin Eldred from asserting infringement claims against any of his customers for the use of the same lighter that had already been adjudged to be non-infringing. *Id.* The Supreme Court ultimately upheld the injunction, holding that the prior judgment, "whether it proceeds upon good reasons or upon bad reasons, whether it was right or wrong, settled finally and everywhere, and so far as Eldred … was concerned, that Kessler had the right to manufacture, use and sell the electric cigar lighter before the court." *Id.* The Court explained that the judgment that Kessler had the right to sell his lighter came with "the corresponding duty of Eldred to recognize and yield to that right everywhere and always." *Id.* If Eldred were able to continue to file suits accusing products previously determined not to infringe, "the result will be practically to destroy Kessler's judgment right." *Id.* at 290. In short, by prevailing in the first suit, Kessler had immunized his lighter from any future infringement suits brought by Eldred.

The *Kessler* doctrine remains binding Supreme Court precedent, and the Federal Circuit recently reaffirmed its validity. *See Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045 (Fed. Cir. 2014). In *Brain Life*, the Federal Circuit recognized that "[t]here exists a separate and distinct doctrine, known as the *Kessler* Doctrine, that precludes some claims that are not otherwise barred by claim or issue preclusion." *Id.* at 1055-56. "The *Kessler* Doctrine fills the gap between these preclusion doctrines, … allowing an adjudged *non-infringer* to avoid repeated harassment for continuing its business as usual post-final judgment in a patent action where circumstances justify that result." *Id.* at 1056. The principle underlying this conclusion is that "when an alleged infringer prevails in demonstrating noninfringement, the specific accused device(s) acquires the 'status' of a noninfringing device vis-á-vis the asserted patent claims" and "when the devices in the first and second suits are essentially the same, the new product(s) also acquires the status of a noninfringing

device vis-á-vis the same accusing party or its privies." *Id.* at 1057 (internal quotation marks omitted). The Federal Circuit held that "because Elekta's GammaPlan, GammaKnife, and SurgiPlan are essentially the same accused products" found non-infringing in a prior suit, "Brain Life's claims are barred under the *Kessler* Doctrine." *Id.* at 1058.

Shortly after *Brain Life* was decided, this Court recognized that *Brain Life* had "demonstrat[ed] that *Kessler* is still in force, and … that it 'precludes some claims that are not otherwise barred by claim or issue preclusion.'" *SpeedTrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at *9 (N.D. Cal. May 6, 2014) (quoting *Brain Life*, 746 F.3d at 1055-56). And this Court accordingly held an infringement suit barred under *Kessler* where the same plaintiff had previously lost an infringement suit involving the same patent and essentially the same product. *Id.*

### B. The *Kessler* Doctrine Bars TPL's Infringement Claims

Here, as in *Kessler*, *Brain Life*, and *SpeedTrack*, there is a prior judgment that Defendants' products do not infringe the same patents at issue. In particular, the ITC found the memory card readers in Defendants' products do not infringe the patents-in-suit because they have fixed signal assignments and thus do not meet the "mapping" limitations required by all asserted claims. That judgment is final because TPL deliberately elected not to appeal to the Federal Circuit.

The *Kessler* doctrine bars TPL from relitigating its claims of infringement against Defendants' products in this Court. That the prior judgment came from the ITC, rather than a federal court, is of no moment. In *Kessler* itself, the Supreme Court recognized that the nature of the court did not matter: "If rights between litigants are once established by the final judgment of *a court of competent jurisdiction* those rights must be recognized in every way, and *wherever the judgment is entitled to respect*, by those who are bound by it." *Kessler*, 206 U.S. at 289 (emphases added). It is beyond dispute that the ITC – and the Federal Circuit – had jurisdiction over the matter at issue here, and that the ITC's judgment is entitled to respect. [5] If TPL had any basis to

---

[5] *See also B&B Hardware, Inc. v. Hargis Indus., Inc.*, No. 13-352, slip op., 575 U.S. __ (2015) (holding that findings made by the Trademark Trial and Appeal Board ("TTAB") can have a preclusive effect in subsequent federal court proceedings if the usual requirements of issue preclusion are met, and the *issues litigated in the two actions are "materially the same."*) (emphasis added).

disturb any aspect of the ITC's judgment, the proper course would have been to appeal. Having elected not to do so, TPL may not now press infringement claims against Defendants' products that the ITC has finally resolved.

The *Kessler* doctrine applies even where no Federal Circuit appeal is available and the question of infringement is resolved by a state court in interpreting a license agreement. In *MGA, Inc. v. General Motors Corp.*, 827 F.2d 729 (Fed. Cir. 1987), the Federal Circuit held that the *Kessler* doctrine applies to state court judgments about the scope of license agreements that effectively resolve infringement questions, even though jurisdiction over infringement is exclusively federal. The court explained: "In this case, MGA selected its first defendant, first forum and first remedy. MGA had its day in court with a full trial on the merits of its case. … Nor was MGA left without recourse to seek correction of any perceived errors committed by the state court." *Id.* at 735. The same (and more) is true of the ITC judgment here: TPL chose to sue Defendants in the ITC, and chose not to appeal the ITC's decision despite its potential for review of the decision in the Federal Circuit. The *Kessler* doctrine is based on the policy behind preventing harassment and repeat litigation after a finding of non-infringement, and not on the availability of *res judicata*. This policy applies equally to an ITC matter as it does to a state court matter. Indeed, the case for application of the *Kessler* doctrine is even stronger in the ITC context, given the expertise of the ITC in patent matters, as opposed to a state court, which has no jurisdiction at all over patent claims and addressed the patent law issue only because it was a predicate to deciding the contract claim.

Federal Circuit opinions holding that ITC decisions are not binding on district courts as a matter of *res judicata* or collateral estoppel are inapposite because that is not the issue here. *See, e.g., Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558,1569 (Fed. Cir. 1996) ('The district court can attribute whatever persuasive value to the prior ITC decision that it considers justified."); *LSI Corp. et al. v. U.S. International Trade Commission*, No. 14-1410 (Fed. Cir. Mar. 20, 2015) ("decisions of the ITC involving patent issues have no preclusive effect in other

forums.")[6]  None of those cases involved a finding of non-infringement; thus there was no reason to consider the *Kessler* doctrine.  *See, e.g., Cypress,* 90 F.3d at 1562-63 (noting ITC finding of infringement); *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1563 (Fed. Cir. 1996) (considering ITC decision based on sanction for discovery violation).[7] Thus, with respect to an ITC finding of non-infringement, the Federal Circuit has not yet considered the *Kessler* doctrine or the policy behind that doctrine, i.e., the strong interest in preventing parties from getting a second chance at an infringement suit against products that have been found not to infringe.

The Federal Circuit case law on *res judicata* and collateral estoppel is also inapposite because the *Kessler* doctrine was created by the Supreme Court for the exact purpose of "fill[ing] the gaps" when *res judicata* or collateral estoppel are inapplicable but the party should still be bound.  *Brain Life*, 746 F.3d at 1056; *see also SpeedTrack*, 2014 WL 1813292, at *9.  Indeed, the *Kessler* doctrine is a special rule for patents given the particular interest there in preventing unfair harassment with multiple infringement suits.  *Res judicata* and collateral estoppel are general doctrines that apply to all subject matters, and thus do not take account of this particular interest in patent cases.

## C. TPL Cannot Evade the Binding Effect of an ITC Finding of Non-Infringement by Choosing Not to Appeal

An ITC decision is binding under the doctrine of *stare decisis* when the Federal Circuit decides an appeal from that decision.  As the Federal Circuit has explained:

---

[6] Defendants preserve the right to move at a future date for summary judgment based on the persuasive value that should be accorded to the ITC judgment. Defendants also preserve an argument that the Federal Circuit decisions regarding *res judicata* and collateral estoppel, which have never been confirmed by the Supreme Court, are erroneous, though Defendants recognize that they are binding on this Court.

[7] The one case that did involve a finding of non-infringement supports Defendants' position. *Powertech Tech. Inc. v. Tessera, Inc.*, 660 F.3d 1301 (Fed. Cir. 2011).  That case in fact confirms that there are circumstances under which an ITC decision will be binding in later proceedings. In *Powertech*, the Federal Circuit held that the ITC's decision, as affirmed by the Federal Circuit, was binding as a matter of *stare decisis*. *Id.* at 1303-04, 1308. The Federal Circuit did not consider whether the *Kessler* doctrine provided an additional basis for holding that the finding of non-infringement was binding.

> TI also argues that by our denying preclusive effect to ITC determinations and to our decisions in appeals from ITC decisions, district courts would be free to ignore our decisions. That is not correct. District courts are not free to ignore holdings of this court that bear on cases before them. Subsequent panels of this court are similarly not free to ignore precedents set by prior panels of the court.

*Texas Instruments*, 90 F.3d at 1569. The Federal Circuit has recently reiterated that "[a]lthough the resolution of the ITC action will not have preclusive effect on … the district court in this case," the court is "nonetheless bound by *stare decisis* to abide by any legal precedents established by our court in" its decision affirming the ITC's finding of non-infringement. *Powertech*, 660 F.3d at 1308; *see also id.* ("To the extent Tessera's claims against PTI's customers arise from the same set of facts addressed in *Tessera*, the result we reached there would control equally here. Accordingly, we vacate the dismissal on jurisdictional grounds and remand with instructions to apply our decision in *Tessera*").

TPL attempted to avoid this binding effect of *stare decisis* by choosing not to appeal, but a party cannot evade an ITC ruling in this way. The Federal Circuit has never suggested otherwise because in all of the cases regarding the binding effect of ITC rulings, there was an appeal from the ITC judgment. *See Powertech*, 660 F.3d at 1307; *Texas Instruments*, 90 F.3d at 1563; *Bio-Tech. Gen. Corp.*, 80 F.3d at 1563. Indeed, there is no reasonable basis to allow a party to evade an ITC judgment by strategically choosing not to appeal an ITC judgment of non-infringement so as to simply start from scratch in district court.

First, courts consistently refuse to give a party the benefit of a tactical decision not to appeal. For example, the Supreme Court has held that a party that makes "a considered choice not to appeal … cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong …." *Ackermann v. United States*, 340 U.S. 193, 198 (1950). In another case, the Supreme Court held that respondents could not become "windfall beneficiaries of an appellate reversal procured by other independent parties" where the respondents "made a calculated choice to forgo their appeals." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 400-01 (1981); *see also, e.g.*, *Twelve John Does v. Dist. of Columbia*, 841 F.2d 1133, 1141 (D.C. Cir. 1988) ("[W]here the parties seeking relief have made a 'free, calculated, deliberate'

decision not to appeal, Rule 60(b)(6) is simply not available to relieve them of the consequences of that decision, absent extraordinary circumstances."). This simply reflects the general principle that a party's failure to appeal a particular determination bars later relitigation of that issue. *See, e.g., Function Media, L.L.C. v. Kappos*, 508 F. App'x 953, 956 (Fed. Cir. 2013) ("Google's failure to appeal the determined validity of those claims removed them from any subsequent actions."); *EFCO Corp. v. U.W. Marx, Inc.*, 124 F.3d 394, 399-400 (2d Cir. 1997) ("Where a plaintiff's motion to amend its complaint in the first action is denied, and plaintiff fails to appeal the denial, *res judicata* applies to the claim sought to be added in the proposed amended complaint."). In particular, in the administrative context, the decision not to appeal to an Article III court does not deprive the administrative judgment of binding effect. *See, e.g., McLellan v. Perry*, No. 3:12-CV-00391-MMD, 2014 WL 1309291, at *5 (D. Nev. Mar. 27, 2014) ("McLellan's contention that the unreviewed determination of the Hearing Officer cannot have a preclusive effect is contrary to established law… . [T]he claim was litigated at the agency and became final when McLellan chose not to appeal to the state district court."). Here, likewise, the binding effect of the ITC judgment should not be undermined by TPL's decision to forego an appeal.

Second, the reasoning in the *Kessler* line of cases demonstrates that a decision not to appeal is an illegitimate basis to avoid what would be an otherwise binding judgment. For instance, in *Brain Life*, the patentee argued that because he abandoned some of the claims before trial in the first suit, he should be able to relitigate those claims. The court rejected that argument, holding: "Simply, by virtue of gaining a final judgment of noninfringement in the first suit—where all of the claims were or *could have been asserted* against Elekta—the accused devices acquired a status as noninfringing devices, and Brain Life is barred from asserting that they infringe the same patent claims a second time." *Brain Life*, 746 F.3d at 1058 (emphasis added); *see also id.* at 1058-59 ("Brain Life instead focuses its efforts on demonstrating that the patent claims in the two suits are not essentially the same. That is beside the point under the *Kessler* Doctrine because Elekta's … products have acquired the status of noninfringing products as to the '684 *patent*, *i.e.*, all claims that were brought or *could have been brought* in the first suit." (emphasis added)).

This Court similarly recognized in *SpeedTrack* that what matters under *Kessler* are the arguments the plaintiff could have pursued, regardless of whether it actually did so. *See SpeedTrack*, 2014 WL 1813292, at *9 ("Certainly, if the *Kessler* doctrine bars the assertion of new *claims*, it must also bar the assertion of new *theories* involving the same, already-asserted claims."). Simply put, once a product is given a status of a non-infringing product as to a certain patent, that status cannot be undone by arguments about what a plaintiff might have done differently in the first suit. This logic applies equally to TPL's decision not to appeal—what matters is that TPL could have brought all of its arguments to the Federal Circuit. TPL chose not to do so and it cannot undermine the binding effect of the ITC judgment.

Finally, *Kessler* was decided as a policy matter to ensure fairness to makers of products adjudged to be non-infringing, and those policies uniformly support giving binding effect to the ITC judgment here. TPL filed suit in district court and in the ITC within one day of each other, alleging the same basis for infringement. In the ITC proceeding, TPL had every incentive to—and in fact did—make its very best arguments for infringement. Accordingly, this case is nothing more than a second attempt by TPL to pursue claims on which it already failed in another forum and to force Defendants to defend themselves again after being forced to expend substantial sums in defending themselves in the ITC—a prime example of harassment. The proper way for TPL to challenge that decision would have been an appeal to the Federal Circuit, not to attack it indirectly (or otherwise ignore it) in this Court. Such an indirect challenge is especially inefficient for the parties and the Court given that the ultimate review in this matter would also rest with the Federal Circuit. And if allowed, it would wrongfully encourage parties not to appeal in the hope of receiving a different opinion from another forum, which they could still appeal if unsuccessful.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this motion in accordance with Rule 12(c) and enter judgment on the pleadings, dismissing Plaintiffs' pending causes of action with prejudice.

DATED:  May 1, 2015

By <u>*/s/Marcia H. Sundeen*</u>
Marcia H. Sundeen (admitted Pro Hac Vice)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:     (202) 346-4000
Facsimile:     (202) 346-4444
Email: msundeen@goodwinprocter.com

T. Cy Walker (admitted Pro Hac Vice)
KENYON & KENYON LLP
1500 K Street, NW, Suite 700
Washington, DC 20005
Telephone: 202-220-4200
Facsimile: 202-220-4201
Email: cwalker@kenyon.com

Megan Whyman Olesek (CA Bar No. 191218)
KENYON & KENYON LLP
1801 Page Mill Road, Suite 210
Palo Alto, CA 94304
Telephone: 650-384-4700
Facsimile: 650-384-4701
Email: molesek@kenyon.com

Rose Cordero Prey (admitted Pro Hac Vice)
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
Telephone: 212-425-7200
Facsimile: 212-425-5288
Email: rcordero@kenyon.com

COUNSEL FOR DEFENDANT HEWLETT-
PACKARD
COMPANY

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

/s/ David M. Maiorana
David M. Maiorana (Ohio Bar No. 0071440)
Email: dmaiorana@jonesday.com
Calvin P. Griffith (Ohio Bar No. 0039484)
Email: cpgriffith@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Tracy A. Stitt (Washington Bar No. 1015680)
Email: tastitt@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Jacqueline K. S. Lee (CA Bar No. 247705)
Email: jkslee@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 739-3939
Facsimile: (650) 739-3900

ATTORNEYS FOR DEFENDANTS
CANON INC. AND CANON U.S.A., INC

/s/ Gordon M. Fauth, Jr._____
Gordon M. Fauth, Jr. (SBN: 190280)
gmf@classlitigation.com
LITIGATION LAW GROUP
1801 Clement Ave., Ste. 101
Alameda, CA 94501
Tel: (510) 238-9610
Fax: (510) 337-1431

Kent E. Baldauf, Jr.
kbaldaufjr@webblaw.com
Bryan P. Clark
BClark@webblaw.com
THE WEBB LAW FIRM
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Tel: (412) 471-8815
Fax: (412) 471-4094

COUNSEL FOR DEFENDANTS NEWEGG
INC. AND ROSEWILL INC.,

Kyle T. Barrett (State Bar No. 284595)
kbarrett@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:    (650) 739-3939
Facsimile:     (650) 739-3900

William E. Devitt (Admitted *Pro Hac Vice*)
wdevitt@jonesday.com
Matthew J. Hertko (Admitted *Pro Hac Vice*)
mhertko@jonesday.com
JONES DAY
77 W. Wacker, Suite 3500
Chicago, IL  60601
Telephone:    (312) 782-3939
Facsimile:     (312) 782-8585

ATTORNEYS FOR DEFENDANTS
SEIKO EPSON CORPORATION AND
EPSON AMERICA, INC.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that, on May 1, 2015, I caused the foregoing document to be served on counsel of record via the Court's CM/ECF system.

Dated:  May 1, 2015

By */s/Gordon M. Fauth*
Gordon M. Fauth
Attorney for Defendant Hewlett-Packard Company

Megan Rae Whyman Olesek (Bar No. 191218)
KENYON & KENYON LLP
1801 Page Mill Road
Suite 120
Palo Alto, CA 94304-1216
Telephone:    (650) 384-4701
Facsimile:    (650) 384-4701
Email: molesek@kenyon.com

T. Cy Walkser (admitted Pro Hac Vice)
KENYON & KENYON LLP
1500 K Street, NW, Suite 700
Washington, DC 20005
Telephone: 202-220-4200
Facsimile: 202-220-4201
Email: cwalker@kenyon.com

Marcia H. Sundeen (admitted Pro Hac Vice)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:    (202) 346-4000
Facsimile:    (202) 346-4444
Email: msundeen@goodwinprocter.com

*ATTORNEYS FOR DEFENDANTS
HEWLETT-PACKARD COMPANY.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| TECHNOLOGY PROPERTIES LIMITED LLC, et al.,<br><br>       Plaintiffs,<br><br>      vs.<br><br>HEWLETT-PACKARD COMPANY,<br><br>       Defendant. | Civil Action No. 4:14-cv-03643-CW<br><br>DECLARATION OF MARCIA SUNDEEN IN SUPPORT OF THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>Date:   June  18, 2015<br>Time    2:00 pm<br>Place:  Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |
| TECHNOLOGY PROPERTIES LIMITED LLC and MCM PORTFOLIO LLC,<br><br>       Plaintiffs, | Civil Action No. 14-03640 CW<br><br>DECLARATION OF MARCIA SUNDEEN IN SUPPORT OF THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS |

DECLARATION OF MARCIA SUNDEEN IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON
THE PLEADINGS

| | |
|---|---|
| v. | |
| CANON INC., et al., | |
| Defendants. | Date: June 18, 2015<br>Time 2:00 pm<br>Place: Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |
| TECHNOLOGY PROPERTIES LIMITED LLC, et al., | Civil Action No. 14-03640 CW<br><br>DECLARATION OF MARCIA SUNDEEN IN SUPPORT OF THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS |
| Plaintiffs,<br><br>vs.<br><br>NEWEGG INC. et al.,<br><br>Defendants. | Date: June 18, 2015<br>Time 2:00 pm<br>Place: Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |
| TECHNOLOGY PROPERTIES LIMITED LLC, et al., | Civil Action No. 3:14-cv-03646-CW<br><br>DECLARATION OF MARCIA SUNDEEN IN SUPPORT OF THE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS |
| Plaintiffs,<br><br>vs.<br><br>SEIKO EPSON CORPORATION, et al.,<br><br>Defendants. | Date: June 18, 2015<br>Time 2:00 pm<br>Place: Courtroom 2 – 4th Floor<br>Judge: Hon. Claudia Wilken |

# DECLARATION OF MARCIA H. SUNDEEN

I, Marcia H. Sundeen, hereby declare as follows:

1.     I am a partner in the law firm of Goodwin Procter LLP, counsel to Defendant Hewlett-Packard Company in this action.  I work primarily out of the Washington D.C. office of Goodwin Procter LLP.  I make these statements in support of Defendants' accompanying motion for judgment on the pleadings. These statements are made based on my own personal knowledge and the records, proceedings and communications in the above-captioned matters and the ITC matter (*Certain Computers and Computer Peripheral Devices, and Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-841 (the "841 investigation")), and if called on, I could and would competently testify thereto.

2.     On March 27, 2012, TPL filed a complaint in the ITC under Section 337, alleging infringement of*, inter alia*, the same three patents that are asserted in this action, and requesting the ITC to institute an investigation.  The three patents are U.S. Patent Nos. 7,295,443 (the '443 Patent"), 7,522,424 (the '424 Patent") and 7,719,847 (the '847 Patent").  All three of these patents relate to memory card readers, which are used in electronic devices such as laptops and printers. TPL alleged that memory card readers used in Defendants' products infringed these three patents. The ITC instituted an investigation based on TPL's allegations of infringement and the investigation proceeded.

3.     The ITC investigation proceeded before Administrative Law Judge Essex.  The parties engaged in extensive fact and expert discovery.  Judge Essex held a *Markman* hearing in August 2012 and issued a lengthy *Markman* order in October 2012.  In January 2013, Judge Essex held a four-day evidentiary hearing where the parties presented extensive fact and expert testimony.  After the hearing and briefing, Judge Essex, in August 2013, ruled that Defendants' products did not infringe any of the three patents at issue in this suit.  With regard to the patents-in-suit, Judge Essex found that the memory card readers in Defendants' products did not satisfy the "mapping" limitations required by all asserted claims.

1   4.      TPL petitioned the Commission for review and reversal of Judge Essex's conclusions.  The

2   Commission granted review and, after additional briefing, issued an opinion affirming the ALJ's

3   decision of noninfringement.

4   5.      Attached hereto as Exhibit A is a true and correct copy of the Commission Opinion in the

5   841 investigation, issued on January 9, 2014.

6   6.      On April 23, 2015, my co-counsel, Kenyon & Kenyon LLP, contacted counsel for TPL to

7   advise them of Defendants' intention to file this motion and set the hearing date for June 18, 2015,

8   when the parties to this motion will be presenting argument regarding claim construction, in order

9   to conserve court and party resources.  TPL's counsel did not cite any unavailability or other

10  schedule conflict during this call, but stated that he would check with his team and advise of any

11  schedule conflict by the following Tuesday.  The parties exchanged further correspondence on this

12  subject on April 28, 29 and 30, in which TPL objected generally to the timing of the instant motion

13  at this stage of the proceedings, and stated that TPL's counsel is busy preparing its reply claim

14  construction brief.  TPL did not identify any scheduling conflict specific to the June 18 hearing date

15  in the course of the correspondence.

16          I declare under penalty of perjury, under the laws of the United States of America, that the

17  foregoing is true and correct.

18          Executed on this 1st day of May, 2015, in Washington, D.C.

22                                  /s/ Marcia H. Sundeen

DECLARATION OF MARCIA SUNDEEN IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON
THE PLEADINGS

# EXHIBIT A

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## Washington, D.C.

In the Matter of

**CERTAIN COMPUTERS AND COMPUTER PERIPHERAL DEVICES, AND COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME**

Investigation No. 337-TA-841

## COMMISSION OPINION

### I. INTRODUCTION

The Commission instituted this investigation on May 2, 2012, based on a complaint

filed by Technology Properties Limited, LLC ("TPL") of Cupertino, California. 77 *Fed.*

*Reg.* 26041 (May 2, 2012). The complaint alleged violations of section 337 of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1337, by reason of infringement of certain claims of U.S.

Patent Nos. 6,976,623 ("the '623 patent"), 7,162,549 ("the '549 patent"), 7,295,443 ("the

'443 patent"), 7,522,424 ("the '424 patent"), 6,438,638 ("the '638 patent"), and 7,719,847

("the '847 patent"). The complaint further alleged the existence of a domestic industry. The

notice of investigation named twenty-one respondents, some of whom have since settled

from the investigation. As a result of these settlements, the '638 patent is no longer at issue,

as it has not been asserted against the remaining respondents. The Office of Unfair Import

Investigations did not participate in this investigation.

On October 4, 2012, the presiding Administrative Law Judge ("ALJ") issued a

*Markman* order construing disputed claim terms of the asserted patents. Order No. 23. On

January 7-11, 2013, the ALJ conducted a hearing, and on August 2, 2013, the ALJ issued his

final Initial Determination ("the ID"). The ALJ found that TPL demonstrated the existence of a domestic industry, as required by 19 U.S.C. § 1337(a)(2), through TPL's licensing investments under 19 U.S.C. § 1337(a)(3)(C). ID at 152-55. The ALJ rejected TPL's domestic industry showing based upon OnSpec Electronic, Inc.'s expenses under section 337(a)(3)(A)-(C). *Id.* at 155-57. The ALJ found that TPL's technical prong showing for each patent was insufficient to demonstrate that the alleged domestic industry products actually practice one or more claims of each asserted patent. ID at 134-138. Yet, because the ALJ ruled that such a showing is not required under existing Commission precedent for licensing industries under subsection (a)(3)(C), the ALJ found that TPL showed the existence of a domestic industry in licensing the asserted patents.

The ALJ found that the respondents had not shown that any of the asserted patent claims are invalid. However, the ALJ found that TPL demonstrated infringement only of the '623 patent, and not the other patents. With respect to the '623 patent, the ALJ found that TPL demonstrated direct infringement of the asserted apparatus claims (claims 1-4 and 9-12).[1] Accordingly, the ALJ found a violation of section 337 only as to the '623 patent. TPL asserted the '623 patent against only a subset of respondents ("the '623 respondents"), specifically Acer, Inc. ("Acer"); Kingston Technology Co., Inc. ("Kingston"); Newegg, Inc.; and Rosewill Inc. (collectively, "Newegg/Rosewill"). Thus, the ALJ found no violation of section 337 as to the remaining respondents ("the non-'623 respondents"), specifically Canon, Inc.; Hewlett-Packard Co. ("HP"); HiTi Digital, Inc. ("HiTi"); and Seiko Epson Corporation ("Seiko Epson").

---

[1] The ALJ also found that method claims 17-19 of the '623 patent were not infringed. The Commission does not reach those claims, which TPL concedes are no longer within the scope of the investigation, TPL Br. 12 n.3. The Commission vacates the ALJ's findings with respect to those claims.

On August 19, 2013, the parties filed petitions for review.[2] TPL's petition challenged the ALJ's noninfringement determinations for the '443, '424, and '847 patents ("the mapping patents"). TPL did not petition for review of the ALJ's noninfringement determination for the '549 patent. The respondents filed a petition for review, in which the '623 respondents challenged one of the ALJ's claim constructions, and independently challenged the ALJ's finding that the asserted claims of the '623 patent are not anticipated by, or obvious in view of, certain prior art. The '623 respondents also challenged the ALJ's finding that TPL demonstrated the existence of a domestic industry.

The non-'623 respondents contingently challenged the ALJ's determinations. They challenged the ALJ's domestic industry determination on the basis that "[t]here is no evidence that TPL's licensees' efforts relate to 'an article protected by' any of the asserted patents." Resp'ts Pet. 42, 54-56. The petition relies on the Federal Circuit's decision in *InterDigital Communications, LLC v. ITC*, 707 F.3d 1295 (Fed. Cir. 2013), the Court's decision denying rehearing in the appeal from Commission Investigation No. 337-TA-613, *Certain 3G Mobile Handsets and Components Thereof.* These respondents also challenged the ALJ's findings under the economic prong of the domestic industry requirement based on TPL's evidence of expenditures, as well as the nexus between those expenditures and the asserted patents.

---

[2] Complainant Technology Properties Limited LLC's Petition for Review of the Initial Determination (Aug. 19, 2013) ("TPL Pet."); Respondents Acer, Inc., Kingston Technology Company, Inc., Newegg, Inc. and Rosewill Inc.'s Petition for Review of Initial Determination Finding a Violation Based on U.S. Patent No. 6,976,623 and Respondents' Conditional Petition for Review of Initial Determination of Finding of Validity and Domestic Industry of the Remaining Patents in Suit (Aug. 19, 2013) ("Resp'ts Pet."); Contingent Petition for Review of Respondent Hewlett-Packard Company Relating to Domestic Industry (Aug. 19, 2013) ("HP Pet.").

The non-'623 respondents also argued that the four no-violation patents are invalid as anticipated or obvious in view of the prior art, and made additional non-infringement arguments for the three mapping patents, which were raised in TPL's petition.

Respondent HP filed a short petition for review on its own behalf. HP argued for a narrow interpretation of the domestic industry requirement, not only in which "articles protected by" the patent must be found to exist, but in which "protected by" has a narrow meaning:

> "The articles protected by" the asserted IP are those which came to market, or are coming to market, under the protective umbrella of the asserted IP, which these articles commercialize. Articles independently created, and then taxed by a patent owner, such as TPL, are not "protected by" the IP by any reasonable interpretation of that word, and thus fail to satisfy the plain language of the statute.

HP Pet. 5.

On August 27, 2013, the parties filed responses to each other's petitions.[3] In response to the domestic industry challenge lodged by the respondents collectively, TPL argued that the respondents confuse the technical prong with the economic prong and that there is no technical prong requirement for licensing under section 337(a)(3)(C). TPL Reply Pet. 28. In a short reply to HP's petition, TPL argues that HP never raised its theory of domestic industry below, making it waived, and that, in any event, HP's petition failed to satisfy Commission rule 210.43, because HP failed to explain the basis for its petition under Rule

---

[3] Complainant Technology Properties Limited LLC's Response to Respondents Acer, Inc., Kingston Technology Company, Inc., Newegg, Inc., and Rosewill Inc.'s Petition for Review of Initial Determination Finding a Violation Based on U.S. Patent No. 6,976,623 and Response to Respondents' Conditional Petition for Review of Initial Determination of Finding of Validity and Domestic Industry of the Remaining Patents in Suit (Aug. 27, 2013) ("TPL Reply Pet."); Complainant Technology Properties Limited LLC's Response to Respondent Hewlett-Packard Company's Contingent Petition for Review Relating to Domestic Industry (Aug. 27, 2013); Respondents' Response to Complainant Technology Properties Limited, LLC's Petition for Review of the Initial Determination (Aug. 27, 2013) ("Resp'ts Reply Pet.")

210.43(b)(1) (factual findings "clearly erroneous," legal conclusions "erroneous," or that "the determination is one affecting Commission policy").

The Commission determined to review the ID in its entirety. The Commission notice solicited briefing from the parties on remedy, the public interest, and bonding, as well as on five specific questions:

1. Discuss, in light of the statutory language, legislative history, the Commission's prior decisions, and relevant court decisions, including *InterDigital Communications, LLC v. ITC*, 690 F.3d 1318 (Fed. Cir. 2012), 707 F.3d 1295 (Fed. Cir. 2013) and *Microsoft Corp. v. ITC*, Nos. 2012-1445 & -1535, 2013 WL 5479876 (Fed. Cir. Oct. 3, 2013), whether establishing a domestic industry based on licensing under 19 U.S.C. § 1337(a)(3)(C) requires proof of "articles protected by the patent" (*i.e.*, a technical prong). If so, please identify and describe the evidence in the record that establishes articles protected by the asserted patents.

2. Discuss the construction of "accessible in parallel" in view of the prosecution history of the '623 patent (including the Examiner's Statement of Reasons for Allowance, *see Salazar v. Proctor & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005)), and whether the asserted patent claims are infringed and not invalid based upon that construction. Invalidity arguments not dependent on that claim construction should not be briefed.

3. Comment on whether the respondents' invalidity evidence and analysis as to the Pro II system, the Uno Mas article, the Kaneshiro patent, and the '928 Publication, and TPL's evidence and analysis as to the technical prong of the domestic industry requirement, were undisputed. Please cite all evidence in the record that supports your position.

4. Discuss whether TPL demonstrated that the products accused of infringing the '443, '424, and '847 patents receive or interface with SD cards that operate in a four-bit-bus mode, and if so, whether the accused products infringe the asserted claims.

5. If the Commission were to find that the accused products infringe the '443, '424, and '847 patents, discuss whether the SD specification invalidates the asserted claims of those patents.

Notice (October 24, 2013). The notice also solicited briefing from the public on remedy and the public interest.

On November 7, 2013, the parties filed opening submissions in response to the above-listed questions,[4] as well as separate submissions on remedy the public interest, and bonding. That same day, non-party Intel Corp. filed comments on remedy and the public interest, supportive of the respondents. On November 15, 2013, the parties replied to each other's submissions.[5] On December 11, 2013, TPL and Acer filed a joint motion to terminate the investigation as to Acer on the basis of a settlement agreement, which we granted in our notice terminating the investigation.

## II.  DISCUSSION

The respondents' petition for review and their subsequent briefing present a substantial domestic industry question, specifically, whether TPL, in alleging the existence of a domestic industry under section 337(a)(3)(C), must demonstrate the existence of articles practicing the asserted patents.[6] We first address the patent issues in this investigation before turning to domestic industry.

---

[4] Complainant Technology Properties Limited LLC's Response to the Notice of Commission Determination to Review in the Entirety a Final Initial Determination Finding a Violation of Section 337 (Nov. 7, 2013) ("TPL Br."); Respondents' Written Submission Addressing Certain Issues Enumerated in the Notice of Commission Determination to Review in the Entirety a Final Initial Determination Finding a Violation of Section 337 (Nov. 7, 2013) ("Resp'ts Br.").

[5] Complainant Technology Properties Limited LLC's Reply Submission to the Notice of Commission Determination to Review in the Entirety a Final Initial Determination Finding a Violation of Section 337 (Nov. 15, 2013) ("TPL Reply Br."); Reply of Respondents to the Submission of Complainant on Review of the Final Initial Determination (Nov. 15, 2013) ("Resp'ts Reply Br.").

[6] Commissioner Aranoff dissents from the Commission's determination that a complainant is required to demonstrate the existence of articles practicing the asserted patents in order to show a domestic industry based on licensing under section 337(a)(3)(C). She does not reach the question of whether there is a statutory requirement that a complainant demonstrate the existence of articles practicing the asserted patents for engineering and research and development industries under section 337(a)(3)(C). She otherwise joins the Commission's analysis to the extent that it is not inconsistent with her dissenting views.

### A.     Patent-Related Issues Concerning the '623 Patent

The '623 patent is directed toward a device into which several types of memory cards can be plugged at the same time, the memory cards being "accessible in parallel to transfer data from the" first card to the second card. '623 patent claims 1, 9; *accord* claim 17. The accused products, after accounting for respondent Acer's recent termination from the investigation, are memory card readers distributed by Kingston and Newegg/Rosewill. ID at 24-25. TPL asserted independent claims 1, 9, and 17 and dependent claims 2-4, 10-12, and 18-19. ID at 12. For domestic industry, TPL relied upon claim 1. ID at 137.

As noted earlier, the ALJ found a violation of section 337 as to the '623 patent. The principal dispositive issue regarding this patent is whether the patentee's amendments to the claims, and explanations of those amendments, constitute disavowal as to patent scope with regard to what is meant by "accessible in parallel." The ALJ concluded that there was no disavowal and found that the accused products infringe the claims. The ALJ then found that the respondents failed to demonstrate that the asserted claims are invalid.

### 1.     Claim Construction and Infringement: "Accessible in Parallel"

The ALJ's finding of infringement was based on his claim construction of "accessible in parallel to transfer data" from one type of memory card to another. '623 patent claims 1, 9. Under guiding case law, the words of a claim are usually afforded their "ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). An exception to this canon of construction applies "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* Throughout proceedings, the respondents argued that, based

upon prosecution history disavowal, "accessible in parallel" requires that the claimed system be able to read from one type of memory card while writing to the other.

### a)    Recitation of the File History

Claim 1, which is illustrative, issued from application claim 1, which called, *inter alia*, for "a plurality of memory card interfaces accessible in parallel."[7]  The patent examiner rejected all of the application claims over a prior art patent application to Pua (U.S. 2002/0178307).  Office Action (Aug. 22, 2003).  Pua disclosed a memory card reader for connecting different types of memory cards to a computer.  Pua contains a "memory card switching circuit" for controlling which memory card to access at any time.  Pua ¶ 32.

In response to this rejection, the applicants explained (without amendment in this regard):

> Claim 1 requires a "memory card interface apparatus comprising a plurality of memory card interfaces . . . the plurality of memory card interfaces accessible in parallel." (*emphasis added*).  In contrast, Pua does not teach or suggest that the multiple card adapter 10 can provide parallel access to the interfaces 30.  Rather, Pua merely teaches a multiple memory card adapter that provides an interface for various types of memory cards.  Nowhere does Pua teach or suggest that these interfaces are accessible in parallel.

Amendment at 9 (Dec. 9, 2003) (emphasis in original).

The examiner rejected the claims again:

> In response to applicant's argument that Pua et al does not teach or suggest that the multiple card adapter 10 can provide parallel access to the interfaces 30 . . . , in Pua et al the interfaces 30 are accessible in parallel in that they are connected to the memory card control interface 20 in parallel.  The memory card control interface 20 includes a memory card switching circuit for managing data and command flow to the memory cards, and switches between card

---

[7] Asserted independent claims 9 and 17 of the '623 patent issued from application claims 10 and 19, respectively.  As claim 17 is no longer at issue, we do not address it further, though throughout the prosecution history, the amendments to issued claims 1, 9, and 17 were consistent and indistinguishable.

> interfaces depending on which type of card is being accessed (see paragraphs 32, 37, and 38). Since the memory card control interface 20 is capable of accessing specific interfaces 30, the interfaces 30 are connected to the memory card control interface 20 in parallel. If the interfaces 30 were connected to the memory card control interface 20 in serial, the memory card control interface 20 would have to access one interface type . . . while sending control signals through at least one second interface type . . . . Thus, it is clear that the interfaces 30 are connected to the memory card control interface 20 in parallel. Therefore, the teachings of Pua et al meet the claimed limitation that the interfaces are accessible in parallel.

Final Office Action at 3 (Mar. 5, 2004).

In attempting to overcome the rejection, the applicants amended the claims from

"accessible in parallel" to "being accessible in parallel" (application claims 1 and 10), and

explained:

> The above-emphasized limitation of claim 1 requires that the plurality of memory card interfaces be accessible in parallel. The Examiner's above-quoted argument merely shows that the interface 30 for each type of memory card is connected to the memory card control interface 20 in parallel. However, the fact that the interface 30 for each type of memory card is connected in parallel does not mean that access to the interfaces 30 occurs in parallel.

> In fact, Pua describes that the memory card control interface 20 comprises a memory card switching circuit which is switched to one of the interfaces 30 under control of a microprocessor. For example, in paragraph 32, Pua states, "If, for example, the host reads from or writes to a Compact Flash card, the microprocessor will switch this circuit to the Compact Flash interface. If, for example, the host reads from or to a Smart Media card, the microprocessor will switch this circuit to the Smart Media interface." Thus, in other words, depending on the type of card being written to or read from, the microprocessor switches the memory card switching circuit to the interface that supports the card being written to or from. Since the memory card switching circuit is switched between interfaces, it follows that no more than one interface can be operative at a given point in time. Thus, access to the interfaces does not occur in parallel.

Amendment at 7 (Apr. 29, 2004) (emphasis in original).

In his next rejection, instead of relying solely on the Pua application, the examiner relied for anticipation on U.S. Patent No. 6,381,513 to Takase.[8] Office Action (May 27, 2004). That patent discloses a computer terminal that accommodates several memory cards at once. Takase explains that its "memory card interface 223 can simultaneously accept a plurality of memory cards 1 so that it can read, erase and write the data in parallel." Takase patent col. 13 lines 9-12.

In response to this rejection, the applicants amended application claim 1 as follows, with similar amendments to application claim 10:

1.     (Currently Amended) A memory card interface apparatus comprising:

a plurality of memory card interfaces, with at least a subset of the plurality of memory card interfaces ~~configured~~ being selectively operable to interface with a plurality of memory cards of a first type, ~~the plurality of memory card interfaces accessible~~ in parallel.

Amendments (June 16, 2004). The applicants explained that the memory card system of Takase was "not subject to selection." *Id.* at 6-7; *see* Takase patent col. 14 line 34 – col. 15 line 18. The examiner disagreed, and again rejected the claims as anticipated by Takase. Office Action 15 (Sept. 2, 2004).

The applicants amended the claims again, with the amendments to claim 1 shown below:

---

[8] The examiner also found the claims obvious in view of Takase and Pua together.

1.    (Currently Amended) A memory card interface apparatus comprising:

a plurality of memory card interfaces, ~~with at least a subset of the plurality of memory card interfaces being selectively operable to interface with a plurality of memory cards of a first type~~ comprising a first subset to interface with a memory card of a first type and a second subset to interface with a memory card of a second type, wherein the memory card of the first type and the memory card of the second type are accessible in parallel.

Amendment (Nov. 22, 2004). The applicants explained:

> Takase describes a system in which a plurality of memory cards of the same type may be accessed in parallel. For example, see columns 15 and 16. However, Takase fails to teach or suggest that a memory card of the first type and a memory card of a second type may be accessed in parallel.
>
> Pua (US 2002/0178307) describes a system which provides serial access to a number of memory cards of different types (see paragraph 37, column 2). However, Pua does not teach or suggest that a memory card of a first type and a memory card of a second type may be accessible in parallel.
>
> Thus, the combination of Takase and Pua would provide a system in which there would be parallel access for memory cards of the same type, and serial access for memory cards of different types. The combination of Takase and Pua would still fail to teach or suggest that a memory card of the first type and a memory card of the second type may be access [sic] in parallel, as recited in claim 1.

*Id.* at 5 (emphasis in original).

Another rejection followed, this time relying on the combination of Takase and Pua, as opposed to each individually. Office Action (Feb. 5, 2005). The examiner argued that a person of ordinary skill would have been motivated to combine the two references "in order to provide the ability to interface with a plurality of memory cards as desired/required by users, thereby increasing the versatility and appeal of the system to a greater number of users." *Id.* at 9.

In response to this rejection, the applicants amended the claims again:

1. (Currently Amended) A memory card interface apparatus comprising:

a plurality of memory card interfaces comprising a first subset to interface with a memory card of a first type and a second subset to interface with a memory card of a second type, wherein the memory card of the first type and the memory card of the second type are accessible in parallel to transfer data from the memory card of the first type to the memory card of the second type.

Amendments (Apr. 27, 2005). The applicants explained:

> In contrast [to the newly added limitation], Takase discloses an electronic information distributing terminal for writing electronic information (such as text information and corresponding motion image information) into a memory card. . . . Takase's terminal does not teach or suggest transfer data [sic] from the memory card of the first type to the memory card of the second type.

> Also, Pua discloses a multiple memory card adapter that comprises an interface for various types of memory cards, so that only one adapter is needed to allow different types of memory cards to be read from or written to by a host computer. Pua also does not teach or suggest transfer data [sic] from the memory card of the first type to the memory card of the second type.

> Thus, Takase and Pua, individually or in combination, do not teach or suggest transfer data [sic] from the memory card of the first type to the memory card of the second type, as claimed in independent claims 1, 10 and 19.

*Id.* at 6-7.

These amendments overcame the rejection, but the examiner issued a detailed notice of allowability explaining the improvements over the prior art, including discussion of U.S. Patent No. 6, 010,066 to Itou:[9]

> Itou et al . . . teaches transferring data from a first memory card to a second memory card (see column 1, lines 57-62, and column 2, lines 9-14). However, Itou et al fails to teach or suggest that the first

---

[9] Until this point, the examiner had relied upon Itou in connection with claims 8 and 16 of the '623 patent (application claims 8 and 17), which call for a text display.

memory card and the second memory card are different types or accessible in parallel. Since the transfer of data from a first memory card to a second memory card necessarily includes reading data from the first memory card and then writing the data to the second memory card, the examiner believes that this suggests accessing the first and second memory cards serially, rather than in parallel.

It is also noted that applicants have made a distinction between the memory cards being connected in parallel and the memory cards being accessible in parallel. As applicants have stated, the fact that interfaces are connected in parallel does not mean that access to the interfaces occurs in parallel (see page 7 of the amendment filed on 5/3/2004).

Therefore, without the benefit of applicant's teachings, there is no motivation for one of ordinary skill in the art at the time of the invention to combine the teachings of the prior art in a manner so as to create the claimed invention.

Notice of Allowability at 3 (July 19, 2005).

### b) Prosecution Disavowal Based Upon the File History

The respondents argued that the effect of this exhaustive file history is to disavow switching between two memory cards from the scope of "accessible in parallel," and proposed to the ALJ a construction of "accessible in parallel" as "each transmitting or receiving data simultaneously at a given point in time." Order No. 23 at 60. TPL argued for the plain and ordinary meaning of the term, and as an alternative also argued that "accessible in parallel" means "capable of concurrent read/write access." *Id.* While this appears to be the same as the respondents' position, it is based upon a loose usage of "concurrent" in which fast switching back and forth between two memory cards is sufficient to practice the patent claims. *See, e.g.*, TPL Reply Pet. 11 n.1.

The ALJ found that the prosecution history does not disavow claim scope whereby only one memory card is accessed at a time. To the ALJ, accessible in parallel meant that any one of several inserted memory cards could be accessed at a time: "This language does

not require that the cards function simultaneously, but rather that it be possible for them to be in their respective slots simultaneously, so the operator of the system can access them without taking them in and out." Order No. 23 at 61.

We reverse the ALJ and adopt the respondents' proposed claim construction. We find that the above-quoted statement from Order No. 23 fails to take into account the applicant's statements in the prosecution history distinguishing Pua, as Pua accommodated multiple cards as well. The respondents' petition for review focuses on this point. Resp'ts Pet. 8-19. We agree with the respondents that the ALJ's construction reads the "in parallel" language out of the claims. *Id.* at 11-12. We find the applicants' statements in response to the second rejection to be especially clear to disavow claim scope. The applicants there explained: "that the interface 30 for each type of memory card is connected in parallel does not mean that access to the interfaces 30 occurs in parallel." Amendment at 7 (Apr. 29, 2004) (emphasis in original). The applicants continued (distinguishing Pua):

> Pua states, "If, for example, the host reads from or writes to a Compact Flash card, the microprocessor will switch this circuit to the Compact Flash interface. If, for example, the host reads from or to a Smart Media card, the microprocessor will switch this circuit to the Smart Media interface." Thus, in other words, depending on the type of card being written to or read from, the microprocessor switches the memory card switching circuit to the interface that supports the card being written to or from. Since the memory card switching circuit is switched between interfaces, it follows that no more than one interface can be operative at a given point in time. Thus, access to the interfaces does not occur in parallel.

*Id.*

In support of its argument against prosecution disavowal, TPL argues that the speed with which the switching occurs constitutes parallel access. TPL Reply Pet. 14-16. This argument misapprehends the prosecution history. The prosecution history surrounding the

Pua reference does not have to do with slow switching versus fast switching, but rather with whether switching is encompassed within the phrase "accessible in parallel." Based on the applicants' representations to the PTO, switching back and forth is beyond the scope of "accessible in parallel."

TPL also argues that a finding of disavowal causes construction difficulties with claim 17 of the '623 patent. TPL Br. 11. That claim, unlike claims 1 and 9, covers a method, rather than an apparatus, and includes the step of "selectively operating the first and second subsets to provide access to the memory cards of the first and second types in parallel to transfer data from the memory card of the first type to the memory card of the second type." TPL takes the position that "selectively" in this claim means accessing one card at a time. TPL Br. 11. TPL asserts that therefore, "the examiner (aware of the applicant's remarks) would not have allowed claim 17" based upon our construction of "accessible in parallel." *Id.* at 11-12.

In response to TPL's argument, the respondents assert that claim 17 "is no longer at issue." Resp'ts Reply Br. 10. They also observe that the "selectively" language was not at issue during prosecution, and that there is no reason to conjecture what the examiner could have done if such points had been raised during prosecution. *Id.* at 10-11. Moreover, they argue that "the most natural . . . reading of this phrase in view of the claim language is that the word 'selectively' denotes that it is the first and second interface subsets that are selected for operation . . . , not that the claim allows for – or requires – operating these interfaces one at a time." *Id.* We agree with the respondents' arguments.

Based upon our claim construction, there is no dispute that the accused products use "disclaimed prior art switching circuitry." Resp'ts Pet. 14-18; TPL Reply Pet. 15-16.

Accordingly, we find that the accused products do not infringe the asserted claims of the '623 patent.[10]

The respondents argued on petition that the asserted claims of the '623 patent are invalid as anticipated or obvious only under the ALJ's construction of "in parallel." Resp'ts Pet. 19-38. Because we reject the ALJ's claim construction, we do not reach the respondents' validity arguments based upon that construction.

### B. Patent-Related Issues Concerning the Mapping Patents (the '443, '424 and '847 Patents)

The '443 patent was filed on July 26, 2006. It claims priority to a patent application filed in 2000. The '424 patent is a continuation of the application that issued as the '443 patent. In turn, the '847 patent is a continuation of the application that issued as the '424 patent. The three patents ("the mapping patents"), therefore, share a common specification and are directed to "universal" memory card readers or adapters, i.e., devices that are capable of interfacing with multiple types of memory cards.[11]

The following claims are asserted: from the '443 patent, independent claims 1 and 9, and dependent claims 3, 4, 7, 11, 12, and 14; from the '424 patent, independent claims 25 and 28, and dependent claims 26 and 29; and from the '847 patent independent claim 1, and dependent claims 2 and 3. ID at 12-16.

### 1. Infringement: "Mapping"

The asserted claims are substantially similar and the only dispute at the Commission is with respect to the "mapping" limitations in each claim:

---

[10] Prosecution disavowal makes the doctrine of equivalents unavailable to TPL. See, e.g., American Calcar, Inc. v. American Honda Motor Co.,651 F.3d 1318, 1340 (Fed. Cir. 2011); Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).

[11] Unless otherwise noted, we refer to the '443 specification for convenience.

- " a controller chip to map at least a subset of the at least one set of contact pins to a set of signal lines or power lines, based on an identified type of a memory media card." '443 patent claim 1; *accord* '443 patent claim 9.

- "means for mapping power, ground or data signals between said interconnection pins and said one or more contact pins depending upon the identification of the type of memory card inserted into said port." '424 patent claim 25; *accord* '424 patent claim 28 & '847 patent claim 1.

The ALJ construed what it means "to map":

> Thus, the ALJ construes "to map at least a subset of the at least one set of contact pins to a set of signal lines or power lines, based on an identified type of the memory media card" [and the corresponding claim from '443 patent claim 9] to have its plain and ordinary meaning as outlined above and with the caveat that the mapping must occur based on the type of memory card inserted.

Order No. 23 at 32-33.[12] By "outlined above," the ALJ references his explanation that "mapping is a logical function and does not require some physical connection be changed in the device in order to accomplish it." *Id.* at 29. No party challenged the ALJ's claim construction to the Commission.[13] On review by the Commission, then, is whether, based upon the ALJ's claim construction, the accused products and domestic industry products meet this claim limitation.

Explained at the simplest level, memory cards have sets of contacts for communication. The cards are read from or written to by connecting a pin to each contact (or to at least some of the contacts). *See, e.g.*, '443 patent col. 5 lines 22-24. The '443 patent teaches that notwithstanding that different types of cards have different contacts, an adapter can use the same pin for different cards. Figure 4, for instance, is a "table of pin mappings" that shows how 21 pins could be used to service a "Smart Media" card, an "MMC/SD" card,

---

[12] For the means-plus-function limitations, the ALJ found that the recited function is the same as for the mapping in the non-means-plus-function claims, and that the corresponding structure is a controller. *Id.* at 35-37.

[13] The respondents had urged a narrower definition based upon prosecution disclaimer, *id.* at 28-30, but they chose not to advance that argument to the Commission.

or a Memory Stick. Figure 5 is a "table of pin mappings" that shows how 18 pins could be used to control an even greater variety of cards. When a pin is shared, it is said in the patent to be "multiplexed." The patent specification discusses Figure 5 in greater detail. '443 patent col. 6 lines 25-47.

The accused products are memory card readers that are designed to accommodate SD cards and MMC cards, and no others. The patent explains that these two types of cards "have the same form factor but slightly different pin-out." '443 patent col. 2 lines 1-2. The similarities are such that every further reference of these two types of memory cards in the asserted patents is conflated as "MMC/SD," including in Figures 4 and 5.

The respondents argued, and the ALJ found, that the claimed mapping does not occur because the operation of MMC and SD cards is substantially the same. ID at 37-48. SD cards can operate in one of two manners, with either a one-bit data bus (*i.e.*, reading or writing one bit of information at a time) or with a four-bit data bus (*i.e.*, reading or writing four bits in parallel, like a four-lane road instead of a one-lane road). In single-bit data bus usage, there is no genuine dispute that the MMC and SD cards operate in essentially the same manner. What remains is a theory of infringement reliant upon an SD card utilizing a four-bit data bus. The only difference is that four-bit-bus operation of an SD card uses three more pins than an MMC card (or than one-bit-bus operation of an SD card). ID at 45-46.

The parties' petitions for review contended that the ALJ's comparison of four-bit data-bus SD versus MMC was inconsistent. In particular, the ID states as follows:

> The ALJ finds that Mr. Berg explained that distinguishing between an SD and MMC cards does not show evidence of the claimed "mapping" because, the evidence only shows that
> [                                                        ]
> according to the SD specification. (RX-2885C, Q/A 81-92; see also id. at Q/A 103-05, 110, 112-13, 119-21 (as to Acer).) Specifically, the

ALJ finds that a communication with an MMC card and communication with an SD card occurs across a 1-bit wide data bus. (*Id.* at 87.) The ALJ finds that Mr. Buscaino provided no evidence that any device ever operates using a data bus wider than 1-bit when an SD card is inserted, and Mr. Berg explained that such functionality is optional. (*Id.* at 88, 91-92.) Thus, although the ALJ notes that TPL's arguments regarding mapping were eminently reasonable, the ALJ finds that they have not proven that the "mapping" elements found in all the asserted claims of the '443, '424, and '847 Patents. Accordingly, the ALJ finds that because TPL has failed to prove the presence of all of the elements of the asserted claims, TPL has failed to prove infringement of the asserted claims of the '443, '424, and '847 Patents.

ID at 48. But the ALJ also addressed the operation of the accused products in a four-bit bus

mode. *See, e.g.,* ID at 40-41 ([



]).

On review, we reverse the ALJ's determination that TPL failed to show that the

accused products can transfer data to or from SD cards with a four-bit-bus, and we vacate in

its entirety the paragraph reprinted in the block quotation above.[14] We find that TPL

demonstrated, by a preponderance of the evidence, operation of the accused products in a

four-bit-bus mode.[15] TPL Br. 26-31; TPL Reply Br. 22-27. As discussed extensively in

TPL's briefing, the evidence of record demonstrated the accused products all have

connectors with pins for the four bits of data and that the controllers in the accused products

are designed to process four bits of data. TPL Br. 26-31. We agree with TPL's

characterization of the record that "neither Respondents nor Respondents' experts or fact

witnesses dispute that the accused controllers operate in 4-bit SD mode when an SD card is

---

[14] We give no weight to the ALJ's statement in the block quotation that certain TPL arguments were "eminently reasonable." We do not adopt that statement.

[15] The respondents' arguments in their briefs to the Commission regarding whether the accused products operate in four-bit mode are inconsistent with the evidence of record.

inserted and in 1-bit MMC mode when an MMC card is inserted into the card connector."
TPL Br. 41; *see also id.* at 31.

Moreover, we agree with TPL that its substantial showing went well beyond what is
necessary pursuant to the language of the asserted claims. We find that TPL showed that the
accused products are at least capable of operating in a four-bit bus mode, and that is all that is
ordinarily required for apparatus claims. The Commission most recently addressed this issue
in *Certain Semiconductor Chips and Products Containing Same*, Inv. No. 337-TA-753,
Comm'n Op. 37-39 (July 31, 2012). That case presented a factually analogous question.
The Commission considered the following Federal Circuit authorities in detail: *Fantasy
Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002); *Silicon
Graphics, Inc. v. ATI Technologies., Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010); and *ACCO
Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307, 1310 (Fed. Cir. 2007). The
claim language here is similar to that at issue in *Silicon Graphics* and *Fantasy Sports*.[16]
Accordingly, it was not incumbent upon TPL to demonstrate actual use of the accused
products in four-bit-bus mode.[17] Accordingly, we disagree with the first full paragraph of
page 48 of the ID, in which the ALJ limits TPL's showing to one-bit-bus operation of the SD
card, for which reason it has been vacated. We note that this paragraph in the ID was in

---

[16] In *Silicon Graphics*, the patent claims called for "a rasterization circuit . . . that rasterizes the
primitive according to a rasterization process," and the Federal Circuit found that the claim language merely
required circuitry with the ability to rasterize. *Silicon Graphics*, 607 F.3d at 795. *Fantasy Sports* included
claim language calling for a computer that included "means for setting up individual football franchises"; and
other "means" for selecting rosters, trading players, and so forth. The court found that the infringing software
(apparatus) included these means "regardless whether that means is activated or utilized in any way." *Fantasy
Sports*, 287 F.3d at 1118. The claims in *ACCO*, on the other hand, called for a computer lock with: "a pin,
coupled through said housing, for extending into said security slot proximate said slot engaging portion when
said slot engagement member is in said locked position to thereby inhibit rotation of said slot engagement
member to said unlocked position." *ACCO*, 501 F.3d at 1310. The Federal Circuit there found that the lock
would only infringe after a user inserted the lock into a computer and turned the key to lock it. *Id.* at 1313-14.

[17] As discussed earlier, in any event, we have also found that TPL demonstrated such operation.

conflict with earlier passages of the ID, including from page 45 through the top of page 48, which analyzed four-bit-bus SD operation.

While we vacate one paragraph of the ID, we affirm the remainder of the ALJ's analysis of the accused products. In so doing, we affirm the ALJ's determination that a "card reader does not need to perform the claimed 'mapping' to accommodate SD and MMC card types in the same slot." ID at 46. We disagree with TPL's contention that the ALJ's reasoning was based solely on the SD Specification's initialization processes. TPL Pet. 18-25, 34-35; *see* ID at 47-48. Rather, the ALJ explained that the "only difference between" SD and MMC "cards is that the data in the SD card is a four bit bus, which requires four pins for data, and the MMC card only requires one." ID at 45 (citing RX-2369.0019; RDX-0482). The ALJ explained that the "[███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████]." *Id.*

(citing RX-2888C, Q/A 56-60, 160-79; RX-22369.0019-20; JX-0068.0019-20; RDX-0412; RDX-0480; RDX-0481). We agree with the ALJ that "[██████████████████████████

███████████████████████████]." *Id.* at 45 (citing CX-354C.18; CX-296C.27).

As the ALJ extensively and correctly discussed, in order to communicate with the SD and MMC cards, no mapping is required. Similarly, the mere use of additional signal lines in some circumstances but not others, based upon fixed assignments, does not constitute mapping. ID at 45; Resp'ts Br. 45-46 (citing RX-2885C, Q/A 265, 313, 355, 414, 461, 522, 564; RX-2888C Q/A 589, 634-35 (HP); RX-2888C Q/A 92, 180-88, 926-27; RX-3418C; RX3450 (Seiko Epson); RX-2888C Q/A 835-36, 864-65, CX-0322 (Newegg/Rosewill); RX-2888C, Q/A 256-76, 285-94, 226-47, 250-53 (Canon); RX-2885C, Q/A 75-80 (HP); RX-

2888C Q/A 761-62 (Kingston); RX-2888C, Q/A 453-64; RX-3481C, Q/A 30-36 (HiTi); Tr. 538-39).

## 2. Invalidity

On petition for review, the respondents contingently petitioned for review of the ALJ's determination that the asserted patent claims are not invalid as anticipated in view of certain prior art references. Resp'ts Pet. 60-73. *See* Resp'ts Pet. 62 (SD Specification); Resp'ts Summary of Pet. VI ("To the extent that the Commission reverses the ALJ's finding of non-infringement for the '443, '424, and '847 patents, the Commission should nonetheless find no violation because the record evidence clearly shows that these patents are invalid.").

We have determined to reach two of these arguments. In particular, Question No. 3 of the Commission notice of review asked the parties to brief whether TPL contested the respondents' invalidity arguments regarding Japanese patent publication JP H11-15928 ("the '928 Publication") (RX-817). The ALJ found that the '928 Publication is prior art to the mapping patents under 35 U.S.C. § 102(b), but found that the respondents' arguments in support of invalidity were too cursory to be preserved. ID at 108. Question No. 3 in the Commission notice asked whether invalidity in view of the '928 Publication was uncontested, in which case the Commission might excuse the lack of detailed briefing as to issues for which there was no genuine material dispute. *See, e.g., Certain Mobile Devices, Associated Software and Components Thereof,* Inv. No. 337-TA-744, Comm'n Op. 11-16 (May 18, 2012).

The respondents here argued that the '928 Publication anticipates all the asserted claims of the mapping patents, by describing the publication in only one paragraph, Resp'ts Post-Hearing Br. 153-54, and then asserting anticipation based upon citation to expert

testimony, *id.* at 154. Resp'ts Post-Hearing Br. 154. We affirm the ALJ's application of his ground rules because TPL challenged the respondents' invalidity argument based upon the '928 Publication. *See* TPL Post-Hearing Br. 254; CX-1205C at 157-169, Q/A 974-1035; TPL Post-Hearing Reply Br. 73-75. We note that the respondents moved to strike some of TPL's arguments from TPL's post-hearing reply brief, *see* Resp'ts Br. 34 & n.16, but they did not petition for review of denial of their motion, Resp'ts Pet. 67-69. In view of the ALJ's evidentiary determination that TPL's arguments for the '928 Publication were proper, we sustain the ALJ's application of his ground rules that the respondents' briefing was too cursory to demonstrate invalidity in view of the '928 Publication clearly and convincingly.

We also affirm the ALJ's determination that the respondents failed to demonstrate that the mapping patents are invalid in view of of European Patent 1 037 159 (RX-985) ("Lipponen") and its counterpart U.S. Patent No. 6,612,498 (RX-807). Respt's Pet. 60. These patents teach a memory card reader for reading an MMC card as well as a SIM card. RX-0895 at 1. The only dispute is whether a SIM card – used inside a mobile telephone – is a "memory card" or "memory media card" within the scope of the patent claims. The ALJ concluded that the SIM card, which is used principally for subscriber identification as opposed to data storage, is not a memory card. ID at 105. We find that the respondents have not carried their burden to demonstrate that a person of skill in the art would have understood the claimed "memory media card" to encompass a SIM card as used in Lipponen. In Lipponen, the SIM card, while acknowledged to have memory on it, is used to enable a mobile telephone to access a network. RX-985 at 2 ¶¶ 4-6; *see also* TPL Reply Pet. 44-46.

We do not reach the respondents' other invalidity arguments.

### C. Patent-Related Issues Concerning the '549 Patent

There had been a fifth patent asserted before the ALJ. The claims of the '549 patent

are all directed toward systems and methods in which a "controller chip" determines whether

the memory card itself has a controller, such that if the memory card does not, the "flash

adapter" (the memory card reader) uses "firmware" to "manage error correction" in the

memory card. '549 asserted patent claims 7 and 11; *see also* unasserted claim 1. The

accused products were memory card readers that can read "xD" cards in addition to other

types of cards. *See* ID at 77-78; TPL Post-Hearing Br. 196-97. xD cards, unlike other

memory cards, lack an onboard controller. *See id.* The principal question before the ALJ

was whether detecting the presence of an xD card is sufficient to detect whether a memory

card contains a controller. The ALJ concluded that sensing an xD card was not detecting a

controller, and therefore found that TPL failed to demonstrate infringement. TPL did not

petition for review of that finding, and the Commission affirms the ALJ's finding of

noninfringement as to the '549 patent for the reasons set forth in the ALJ's discussion of

direct infringement on pages 73-81 of the ID. We do not reach, and vacate, the remainder of

the ALJ's findings regarding the '549 patent, including findings regarding invalidity, as well

as the ALJ's interpretation (ID at 69-73) of the Commission opinion from *Certain Electronic*

*Devices With Image Processing Systems, Components Thereof, and Associated Software*, Inv.

No. 337-TA-724 (Dec. 11, 2011).

### D. The Domestic Industry Requirement

The principal domestic industry question on review is whether a showing of articles

protected by the asserted patents is necessary in order for TPL to demonstrate the existence

of a domestic industry under section 337(a)(3)(C). Question No. 1 of the Commission notice

of review sought briefing on this issue from the parties. To address this question, we discuss

the history of section 337(a)(3) and recent decisions of the Federal Circuit before turning to

the facts of this investigation.

### 1. The 1988 Amendments to Section 337 and Commission Practice in Response Thereto

Under paragraph (a)(2) of section 337, a complainant must show that an industry

"relating to the articles protected by the patent . . . exists or is in the process of being

established" in the United States. 19 U.S.C. § 1337(a)(2). Paragraph (a)(3) expands upon

paragraph (a)(2) as follows:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
>
> (A)  significant investment in plant and equipment;
> (B)  significant employment of labor or capital; or
> (C)  substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).

Paragraph 337(a)(3) was added to the Tariff Act as part of the Omnibus Trade and

Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988) ("1988 Act"). The

1988 Act effected significant changes in the requirements for intellectual-property-related

investigations under section 337, including patent-based investigations, which comprise the

bulk of section 337 investigations.[18] Commission precedent prior to 1988 "customarily

defined the domestic industry as consisting of the domestic operations of the patentee

devoted to the exploitation of the teachings of the patent at issue," with "[e]xploitation of

---

[18] Paragraph (a)(3) of section 337 applies to patents, registered copyrights, federally registered trademarks, registered semiconductor mask works, and certain vessel designs. 19 U.S.C. § 1337(a)(1)(B)-(a)(1)(E).

patent rights" including "domestic production and manufacture, development and sale of patented product[s]." *Certain Foam Earplugs*, Inv. No. 337-TA-184, Initial Determination, 0085 WL 1,127,231 at *56 (Nov. 30, 1984), *not reviewed*, 50 *Fed. Reg.* 4277 (Jan. 30, 1985). The 1988 amendments codified such precedent by adding subparagraphs 337(a)(3)(A) and (B) to the statute encompassing "significant investment in plant and equipment," and "significant employment of labor or capital." In addition, domestic industry was broadened to include new subparagraph 337(a)(3)(C), for "substantial investment in" the "exploitation" of the asserted intellectual-property right. 1988 Act § 1342(a) (amending 19 U.S.C. § 1337).

The domestic industry requirement of Section 337, as amended in 1988, has been interpreted by the Commission to consist of an "economic prong" and a "technical prong." *See, e.g., Alloc, Inc. v. ITC*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). The "economic prong" of the domestic industry requirement is satisfied when it is determined that significant or substantial economic activities and investments set forth in subsections (A), (B), and/or (C) of subsection 337(a)(3) have taken place or are taking place. *Certain Variable Speed Wind Turbines & Components Thereof*, Inv. No. 337-TA-376, USITC Pub. No. 3003, Comm'n Op. at 21 (Nov. 1996). "To determine whether an industry relates to the protected articles (the 'technical prong' of the domestic industry requirement), the Commission examines whether the industry produces articles covered by the asserted claims." *Alloc*, 342 F.3d at 1375. To meet the technical prong, at least under section 337(a)(3)(A)-(B), it has been held that the complainant must establish that it practices at least one claim of the asserted patent. *See Certain Microsphere Adhesives, Process for Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op., 1996 WL 1056095, at *7-8 (Jan. 16, 1996). "The test for satisfying the 'technical prong' of the

industry requirement is essentially the same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc*, 342 F.3d at 1375. Thus, the term "technical prong" has been used to refer to a requirement that articles exist that are covered by at least one claim of the asserted patent.

The Commission has established that the "its" in "substantial investment in its exploitation" of subparagraph (a)(3)(C) refers to "the patent, copyright, trademark, mask work, or design."[19] *See Certain Microcomputer Memory Controllers, Components Thereof and Products Containing Same*, Inv. No. 337-TA-331, Order No. 6, 1992 WL 811,299, at *2 (Jan. 8, 1992), *not reviewed*, 57 *Fed. Reg.* 5710 (Feb. 12, 1992). This analysis comports with the legislative history of the 1988 Act, in which an earlier version of subparagraph (C) called for a "substantial investment in exploitation of the intellectual property right, including engineering, research and development, or licensing." H.R. Rep. No. 100-576 at 634 (Apr. 20, 1988) (Conference Report for H.R. 3, "Omnibus Trade and Competitiveness Act of 1988").[20] *See also InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295, 1297 (Fed. Cir. 2013) ("The parties agree that the word 'its' in the last clause of paragraph 337(a)(3) refers to the intellectual property at issue.").

Until now, and relying substantially upon the legislative history of the 1988 Act, our practice has been not to require a complainant to demonstrate for purposes of a licensing-

---

[19] The effect of such an interpretation of subparagraph (C) is to require the showing of a nexus between investment and the asserted intellectual property right. That is to say that the investment must be in "its" exploitation, and without the demonstration of such a nexus, the investment would not be cognizable under subparagraph (C). The Commission's most extensive analysis of the nexus issue, which collected Commission determinations on the matter, is the Commission opinion in *Navigation Devices*. *See Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-694, Comm'n Op. at 7-13 (revised public version). We do not revisit those issues here.

[20] This conference report was expressly incorporated as part of the legislative history of enacted H.R. 4848. Pub. L. 100-418 § 2 (H.R. 4848) (Aug. 23, 1988).

based domestic industry the existence of protected articles practicing the asserted patents.[21] Although there may have been protected articles actually practicing the asserted patents in our past investigations, such a showing was not mandatory. The decisions in these cases instead focused on whether the complainants' showings of licensing expenditures were tied sufficiently closely to the patents asserted in each investigation.

### 2. The Federal Circuit's *InterDigital* Decisions

*InterDigital*[22] is the appeal of the Commission determination in *Certain 3G Mobile Handsets and Components Thereof*, Inv. No. 337-TA-613. In that investigation, although the Commission found no violation of section 337, the Commission found the domestic-industry requirement to be satisfied, and respondent-intervenors Nokia, Inc. and Nokia Corp. (collectively, "Nokia") challenged that finding on appeal.

#### a) Commission Proceedings

In the course of the *3G Mobile Handsets* investigation, the ALJ issued two summary IDs regarding domestic industry. In Order No. 26, the ALJ granted complainant InterDigital Communications LLC's ("InterDigital") motion for summary determination that it satisfied the economic prong of the domestic industry requirement of section 337(a)(3)(C) through InterDigital's U.S.-based expenditures toward its own SlimChip product family (on which

---

[21] *Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same*, Inv. No. 337-TA-432 ("*Minimized Chip Packages*"), Order No. 13 at 11-12, *not reviewed*, Notice, 66 *Fed. Reg.* 58424 (Nov. 21, 2001); *Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-559 ("*Digital Processors*"), Initial Determination at 81-92 (May 11, 2007), *not reviewed in relevant part*, Notice at 2 (Aug. 6, 2007); *Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-694, Comm'n Op. 6-16 (Aug. 8, 2011) (Corrected Public Version) (portfolio licensing); *Certain Liquid Crystal Display Devices, Including Monitors, Televisions, and Modules, and Components Thereof*, Inv. Nos. 337-TA-741 & -749, Comm'n Op. 108-15 (June 14, 2012) (portfolio licensing); *Certain Semiconductor Chips and Products Containing Same*, Inv. No. 337-TA-753, Comm'n Op. 44-51 (Aug. 17, 2012) (Public Version).

[22] *InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318 (Aug. 1, 2012) ("*InterDigital I*"), *reh'g denied*, 707 F.3d 1295 (Jan. 10, 2013) ("*InterDigital II*").

InterDigital intended to rely to satisfy the technical prong). Order No. 26 at 2 n.2 (Mar. 26, 2008) (public version). No petitions for review were filed, and the Commission determined not to review the ID. Notice at 2 (May 5, 2008).

In Order No. 42, the ALJ issued an ID granting complainant InterDigital's motion for summary determination that its licensing activities satisfied the economic prong of the domestic industry requirement of section 337(a)(3)(C). Order No. 42 (March 10, 2009) (public version). In that ID, the ALJ relied upon the *Minimized Chip Packages* and *Digital Processors* investigations we discussed above. *Id.* at 4-5. He found that InterDigital had invested a substantial amount of money in its licensing program and that InterDigital had demonstrated a nexus between the asserted patents and its licensing expenditures. *Id.* at 5-17. There was no dispute that "InterDigital licenses its wireless technology and patents to significant handset and device manufacturers throughout the world," and that through "its ongoing research and development, InterDigital developed proprietary technology that was ultimately incorporated into the wireless communications standards referred to generally as 3G." *Id.* at 6. Left unsaid, at least expressly, was that these licensees import and sell such handsets in the United States. Nokia filed a petition for review, but we determined not to review the ID. Notice at 2 (Apr. 9, 2009).

In view of Commission precedent that there was no separate technical prong for licensing, there was no need for InterDigital to present evidence at the hearing as to its licensing activities, the subject of Order No. 42. Consequently, InterDigital did not pursue such a showing at the hearing, and its post-hearing brief (unlike its pre-hearing brief) relied entirely on licensing. In his final ID, the ALJ found no violation of section 337 because the accused Nokia mobile handsets did not infringe the asserted claims. *See* Notice, 74 *Fed. Reg.*

55068 (Oct. 26, 2009). The ID only devoted one sentence to domestic industry: "The domestic industry requirement has been satisfied based upon complainants' licensing activities, see Order No. 42 (March 10, 2009) (unreviewed)." Final Initial and Recommended Determinations 225 (Aug. 14, 2009). There was no analysis in the ID concerning the previous Order No. 26, regarding a domestic industry founded upon, *inter alia*, InterDigital's research and development expenses.

On review, the Commission clarified certain claim constructions, but terminated the investigation with a finding of no violation owing to noninfringement. *74 Fed. Reg. 55068.* InterDigital took an appeal and Nokia intervened to defend the Commission's finding of no violation of section 337 on the additional basis that InterDigital failed to demonstrate a domestic industry through its licensing. *InterDigital I*, 690 F.3d at 1329.

**b)  The Federal Circuit's Decision in *InterDigital I***

On appeal, the Federal Circuit reversed certain claim constructions that undergirded the finding of noninfringement, remanding the investigation to the Commission. *Id.* at 1320. The court rejected Nokia's challenge to the Commission's domestic industry determinations. The court agreed with the Commission's finding that "the required United States industry can be based on patent licensing alone; it does not require that the articles that are the object of the licensing activities (*i.e.*, the 'articles protected by the patent') be made in this country." *Id.* at 1329. The Court noted that the Commission had been consistent in reaching this conclusion and that the Commission has not "required that the licensed product be manufactured in this country."[23] *Id.* at 1330.

---

[23] The Federal Circuit's focus on "made in this country" was based upon the legislative history of the 1988 Act. *See, e.g.*, 132 Cong. Rec. 30811 (Oct. 14, 1986) (subparagraph (C) "does not require actual
(Footnote continued on the next page)

### c) The Federal Circuit's Decision in *InterDigital II*

Nokia filed a combined petition for rehearing and rehearing *en banc*.[24] Nokia argued that the Commission and the court had improperly construed section 337 to read out the requirement for "articles" in connection with subpart (C) domestic industries. Nokia argued that the statute's requirement of articles is supported by past Federal Circuit decisions and by the 1988 legislative history. Nokia Reh'g Pet. 3-5 (Sept. 17, 2012). According to Nokia, "there must be articles protected by the patent actually in the United States." *Id.* at 9 n.1.

On January 10, 2013, the Federal Circuit denied rehearing and rehearing *en banc*, but issued a supplemental panel opinion in support of the earlier panel decision. The court explained that because "Nokia made a much more detailed argument" on domestic industry "on rehearing than it did in its brief on the merits, a response to Nokia's expanded submission is appropriate." *InterDigital II*, 707 F.3d at 1297. In that opinion, the Federal Circuit provides a comprehensive discussion of the legislative history of the 1988 amendments. *Id.* at 1300-04.

After endorsing the Commission's longstanding interpretation that the word "its" in subparagraph 337(a)(3)(C) refers "to the intellectual property at issue," the Federal Circuit explained as follows:

> The Commission and the court construed those phrases to define the subject matter that is within the statute's protection. With respect to subparagraph (A) of paragraph 337(a)(3), the "significant investment in plant or equipment" that is required to show the existence of a domestic industry must exist "with respect to the articles protected by the patent" in question. That requirement will typically be met if the

production of the article *in the United States* if it can be demonstrated that significant investment and activities of the type enumerated are taking place in the United States") (emphasis added).

[24] Combined Pet. for Panel Reh'g and Reh'g En Banc of Intervenors Nokia Inc. and Nokia Corporation, *InterDigital Commc'ns, LLC v. ITC*, No. 2010-1093 (Fed. Cir. Sept. 17, 2012) ("Nokia Reh'g Pet.").

investment in plant and equipment is directed at production of articles protected by the patent. Similarly, with respect to subparagraph (B) of paragraph 337(a)(3), the "significant employment of labor or capital" that is required to show the existence of a domestic industry must exist "with respect to the articles protected by the patent." That requirement will likewise typically be met by a showing that significant labor or capital is being expended in the production of articles protected by the patent. Applying the same analysis to subparagraph (C) of paragraph 337(a)(3) produces a parallel result that is consistent with the Commission's and this court's statutory construction: *The "substantial investment in [the patent's] exploitation, including engineering, research and development, or licensing" must be "with respect to the articles protected by the patent," which means that the engineering, research and development, or licensing activities must pertain to products that are covered by the patent that is being asserted.* Thus, just as the "plant or equipment" referred to in subparagraph (A) must exist with respect to articles protected by the patent, such as by producing protected goods, *the research and development or licensing activities referred to in subparagraph (C) must also exist with respect to articles protected by the patent,* such as by licensing protected products. This accords with the common description of the domestic industry requirement as having two "prongs": the "economic prong," which requires that there be an industry in the United States, and the "technical prong," which requires that the industry relate to articles protected by the patent. [Citing the Commission opinions in *Stringed Musical Instruments* and *Variable Speed Wind Turbines.*]

*Id.* at 1297-98 (emphasis added).

The highlighted passages in the block quotation expressly hold that there is an "articles" requirement for subparagraph (C), in addition to (A) and (B). That interpretation is reiterated later in the opinion as well. *Id.* at 1299 ("The only question is whether the [sic] InterDigital's concededly substantial investment in exploitation of its intellectual property is 'with respect to the articles protected by the patent.'"). We find that the only plausible interpretation of the opinion is to impose an "articles" requirement for subparagraph (C) domestic industries, including licensing-based domestic industries.[25]

---

[25] In view of the record of the underlying investigation in *3G Mobile Handsets*, the Commission does not find its interpretation of *InterDigital II* to conflict with the Court's disposition of the appeal before it. In
(Footnote continued on the next page)

There are several statements in the Court's opinion that we view as susceptible to being misconstrued. The sentence in *InterDigital II* that the articles are "found in the products that" InterDigital has licensed or "is attempting to exclude," *id.* at 1299, read out of context, might be construed to suggest that a complainant can rely on the accused products to satisfy the domestic industry requirement. Such a reading would make the "articles" requirement illusory because every investigation is founded upon a respondent's "importation into the United States, . . . sale for importation, or . . . sale within the United States after importation," of "articles." 19 U.S.C. § 1337(a)(1)(B). We reject such an interpretation, and conclude that, given the context of the *InterDigital* facts, the Court recognized merely that the licensed domestic industry products and the accused products practiced the same standards and thus practiced the patents, if at all, in the same way.

Similarly, another sentence that might be taken out of context is: "As long as the patent covers the article that is the subject of the exclusion proceeding, and as long as the party seeking relief can show that it has a sufficiently substantial investment in the exploitation of the intellectual property to satisfy the domestic industry requirement of the statute, that party is entitled to seek relief under section 337." *Id.* at 1304. We do not view that sentence as eliminating or excusing the demonstration of articles protected by the asserted patents. The preceding sentence in the Federal Circuit's opinion explains that it "is

particular, there appears to have been no genuine dispute that InterDigital's many licensees practice the asserted patents in the United States in the same manner that the accused infringers do, *see InterDigital II*, 707 F.3d at 1299; *3G Mobile Handsets*, Final ID at 85-94 (WCDMA standard requirements); *3G Mobile Handsets*, Order No. 42 at 6 (incorporation into 3G standards), and therefore specific identification of those products was not required in Commission proceedings prior to the Federal Circuit's review. In addition, although InterDigital did not rely upon engineering and research and development investment in Commission proceedings, the Federal Circuit does not strictly apply waiver in all appeals, and there appears to have been no genuine dispute about the existence of InterDigital's investment. *InterDigital II*, 707 F.3d at 1299 (finding "substantial investment by InterDigital in the research and development that led to the patents in suit"); *id.* at 1298-99 ("The evidence before the Commission showed that InterDigital is a large, publicly traded company" that "has been engaged in research, development, engineering, and licensing of [CDMA] technology in the United States which work later transitioned into research, development, engineering, and licensing of [WCDMA].").

not necessary that the party manufacture the product that is protected by the patent, and it is

not necessary that any other domestic party manufacture the protected article." *Id.* at 1303-

04. Put differently, the existence of an article practicing the patent is required, but that article

need not be made in the United States. The Federal Circuit reiterated that point, expressly, in

the following paragraph: "Congress recognized the development in the United States of

industries that devoted substantial investment to the exploitation of patent rights through

engineering, research and development, and licensing, but not entailing domestic production

of the goods that were protected by those patents." *Id.* at 1304.

On May 10, 2013, Nokia filed a petition for a writ of certiorari on, *inter alia*, the

domestic industry issue. On October 15, 2013, the Supreme Court denied Nokia's petition.

### 3) The Federal Circuit's Decision in *Microsoft*

On October 3, 2013, the Federal Circuit decided *Microsoft Corp. v. ITC*, 731 F.3d

1354 (Fed. Cir. 2013), an appeal from the Commission determination in *Certain Mobile*

*Devices, Associated Software, and Components Thereof*, Inv. No. 337-TA-744. In that

investigation, complainant Microsoft argued for the existence of a domestic industry based

upon the existence of "mobile devices allegedly loaded with the Microsoft Windows mobile

operating system, in which Microsoft had invested substantial resources in the United

States." *Microsoft*, 731 F.3d at 1358.

In *Microsoft*, the Federal Circuit held that there is an articles requirement for

subparagraph (C) domestic industries, at least with regard to subparagraph (C) domestic

industries based upon engineering and research and development. The Federal Circuit held

as follows:

> To establish a violation of section 337, Microsoft had to show not just
> infringement by Motorola's products but the existence of a domestic

industry "relating to the articles protected by the patent." 19 U.S.C. §
1337(a)(2), (3). The ALJ determined that Microsoft failed to make that
domestic-industry showing because it did not offer sufficient proof of
articles that were actually protected by the patent. ... According to the
ALJ, because Microsoft did not point to evidence that its expert examined
client applications in fact running on third-party mobile phones or
confirmed how they operated, Microsoft failed to show that there is a
domestic industry product that actually practices the '376 patent. The
Commission affirmed this determination. ...

In this appeal, we do not reach Microsoft's challenge to the non-
infringement determination because we find substantial evidence to
support the Commission's finding of no domestic industry, which suffices
to support its finding of no violation based on this patent. There is no
question about the substantiality of Microsoft's investment in its operating
system or about the importance of that operating system to mobile phones
on which it runs. But that is not enough under the statute. *Section 337,
though not requiring that an article protected by the patent be produced
in the United States, unmistakably requires that the domestic company's
substantial investments relate to actual "articles protected by the
patent."* 19 U.S.C. § 1337(a)(2), (3). A company seeking section 337
protection must therefore provide evidence that its substantial domestic
investment— *e.g.,* in research and development—*relates to an actual
article that practices the patent,* regardless of whether or not that article is
manufactured domestically or abroad. *InterDigital Commc'ns v. Int'l
Trade Comm'n,* 707 F.3d 1295, 1299, 1304 (Fed.Cir.2013).

731 F.3d at 1361-62 (emphasis added).

Thus, *Microsoft* confirms our reading of *InterDigital II* with respect to the articles

requirement. While *Microsoft* was decided in the context of engineering and research and

development, we do not interpret the opinion to provide a special, and more lenient, test for

licensing-based industries. Rather, the Court discusses "research and development as an

example, with the general statement that an article is required: "A company seeking section

337 protection must therefore provide evidence that its substantial domestic investment—

*e.g.,* in research and development—relates to an actual article that practices the patent,

regardless of whether or not that article is manufactured domestically or abroad." *Id.* at

1362. Additionally, special treatment for licensors is inconsistent with *InterDigital II,* which

did not distinguish between licensing and non-licensing activity under subparagraph (C), but instead looked at all of the subparagraph (C) activities together.

### 4) The Parties' Arguments About the Effect of the Federal Circuit Decisions

Our notice of review asked the parties to brief the following question:

> Discuss, in light of the statutory language, legislative history, the Commission's prior decisions, and relevant court decisions, including *InterDigital Communications, LLC v. ITC*, 690 F.3d 1318 (Fed. Cir. 2012), 707 F.3d 1295 (Fed. Cir. 2013) and *Microsoft Corp. v. ITC*, Nos. 2012-1445 & -1535, 2013 WL 5479876 (Fed. Cir. Oct. 3, 2013), whether establishing a domestic industry based on licensing under 19 U.S.C. § 1337(a)(3)(C) requires proof of "articles protected by the patent" (*i.e.*, a technical prong). If so, please identify and describe the evidence in the record that establishes articles protected by the asserted patents.

Notice at 3.

TPL has taken the position that there is no articles requirement for licensing industries. TPL Br. 7. TPL's discussion is replete with citations to *InterDigital II* regarding "the articles protected by the patent," TPL Br. 1, 3,8 and "the product that it has licensed," *id.* at 3, 4, 7, 8, without ever explaining what those "articles" or "products" are in this investigation, and if they are not present, why that should be excused. We do not find TPL's arguments to be persuasive.

The respondents' position on review is the same as that which respondent HP alone took at the petition stage.[26] HP Pet. 3-5. The respondents recognize that accused products cannot be the articles protected by the patents. Resp'ts Br. 10-12. But the respondents

---

[26] Non-party Intel Corp. filed comments ostensibly on remedy and the public interest. Those comments make the same points as the respondents' briefing on domestic industry. Comments of Intel Corporation Regarding Remedy and the Public Interest in Response to Commission's Notice of Commission Determination to Review Final Initial Determination (Nov. 7, 2013). Non-party Ford Motor Company filed comments on public issues as well. Ford noted that the complainant could not prove that it was making or selling products covered by the patents in this investigation. Letter from William J. Coughlin, Assistant General Counsel, Intellectual Property, Ford Motor Company, to Hon. Lisa R. Barton, Acting Secretary to the Commission (Sept. 6, 2013).

would draw a distinction between patent-holders who license their patents to enable the production of protected articles and patent-holders who license others who already make articles that practice the patent. *Id.* at 9 ("Under this test, a complainant relying on licensing would be required to demonstrate both that its licensing investments are production-driven and that its licensee is making an effort to put the licensed patent to practical use."). In addition, the respondents confuse the test for domestic industry with the test for the process of establishing a domestic industry.

We reject the respondents' invitation to impose a production-driven requirement on licensing-based domestic industries. We note that we have expressed a preference – but not a requirement – for production-driven licensing, giving more weight to evidence of such licensing. *See, e.g., Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-694, Comm'n Op. 25 & n.20 (Aug. 8, 2011).

The respondents base their position on the premise that "article protected by" the patent "must be a product that came to market, or is expected to come to market, under the protective umbrella of the asserted patent that the product commercializes."[27] Resp'ts Br. 7; HP Pet. 5. We find that the plain meaning of "protected by" does not support the respondents' position. By way of example, a licensee benefits in the marketplace from having a license to practice the invention, and thus to make, use, and sell its protected products, while unprotected competitors making the same or similar products are subject to lawsuits and infringement determinations.

---

[27] A logical consequence of respondents' narrow definition of "protected by" would be that a manufacturing company that acquires a patent would not be able to rely on its own pre-existing products to establish the technical prong of the domestic industry requirement.

We also find that the respondents' proffered legislative history of the 1988 Act does not support the respondents' proposed requirement. Indeed, prior to the recent Federal Circuit decisions, we found that the policies supported by the legislative history of the 1988 Act point away from, rather than toward, the result sought by the respondents.[28]

The respondents' position is also untenable because it is inconsistent with the facts of *InterDigital* itself. InterDigital asserted its patents against those who already practiced certain telecommunications standards, and yet the Federal Circuit credited InterDigital's licensing toward its demonstration of a subparagraph (C) domestic industry.[29] Moreover, it appears that the respondents wish to treat licensing differently, and punitively, from other subparagraph (C) investments. Especially in view of the Federal Circuit's treatment of the subparagraph (C) activities and investments together, we see no basis for singling out any subparagraph (C) activity for special treatment, in conflict with Federal Circuit authority.

Moreover, even if the meaning of "protected by" were as malleable as the respondents contend, and thus subject to Commission interpretation under *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the respondents offer no sound policy reasons for interpreting the statute in the manner they seek. Specifically, the respondents wish to invite an inquiry in every investigation as to the motivations not merely of the complainant-licensor, but of its licensees, specifically what they intended to obtain

---

[28] For discussions of the legislative history, *see, e.g., Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same*, Inv. No. 337-TA-432 (*"Minimized Chip Packages"*), Order No. 13 at 11-12, *not reviewed*, Notice, 66 *Fed. Reg.* 58424 (Nov. 21, 2001); *Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-559 (*"Digital Processors"*), Initial Determination at 81-92 (May 11, 2007), *not reviewed in relevant part*, Notice at 2 (Aug. 6, 2007).

[29] The respondents attempt to explain away *InterDigital* in a footnote, but their explanation fails to establish that InterDigital's licensing efforts were production-oriented. Resp'ts Br. 6-7 n.6; Respt's Reply Br. 5-6.

from their licenses, and what they actually did obtain (*i.e.*, whether the actual effect of the license was to bring products to market sooner). Requiring such a showing is needlessly burdensome and costly to the complainant, its licensees, and the Commission; unreasonably subjective; and unwarranted in view of the statutory language and legislative history. Additionally, the respondents would offer no relief to an inventor-complainant in certain circumstances, such as when an industry copies her invention – maybe verbatim from the published patent – before the complainant has had an opportunity to engage in production-oriented efforts of her own. Resp'ts Br. 9; *id.* at 12 ("Unless a licensee entered the license *prior to* researching, engineering and manufacturing its own product, there is no link between that previously infringing product and a complainant's alleged licensing investment."). We disagree with the respondents that their construction of the statute is permissible or appropriate, either under the plain meaning of the statute or its legislative history.

The respondents also appear to confuse the domestic industry test with the separate test for a complainant in the process of establishing a domestic industry. Resp'ts Br. 8. In the respondents' effort to make production-driven licensing the touchstone, they argue that doing so "is analogous to proving that a domestic industry 'is in the process of being established.'" Resp'ts Br. 9 (quoting 19 U.S.C. § 1337(a)(2)); *see also* Resp'ts Reply Br. 5 & nn. 4-5. Commission precedent – and the legislative history underpinning that precedent – requires the complainant alleging an industry "in the process of being established" to "demonstrate that he is taking the necessary tangible steps to establish such an industry in the United States." *Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, Comm'n Op., 2008 WL 2139143, at *10 (May 16, 2008) (quoting H. Rep. 100-40 at 157); *see also Motiva, LLC v. ITC*, 716 F.3d 596, 599-601 (Fed. Cir. 2013). The respondents

seem to assume that this process-of-establishment test is a production test, but they offer no reason why the business in the process of being established cannot instead be a licensing business, *i.e.*, a business in which a patent owner seeks to offer licenses to its intellectual property rights. This type of business was at issue in *Motiva, LLC v. ITC*, 716 F.3d 596, 601 (Fed. Cir. 2013), for example. Second, the "tangible steps" test is important to avoid "process of establishing" from subsuming domestic industry. Process-of-establishing necessarily calls for activity that is directed to launching a nascent industry by requiring a demonstration of the likelihood that the industry will be established in the future. The respondents cite statements meant to reign in abuse of "process of establishing" – Resp'ts Reply Br. 5 n. 5 – as though they applied instead to tests for the existence of a domestic industry. There is no sound reason – and no legislative intent – for applying this higher burden to showing the existence of a domestic industry.

Based on the *InterDigital* and *Microsoft* decisions, a complainant alleging the existence of a domestic industry under 19 U.S.C. § 1337(a)(3)(C) must show the existence of articles.[30] As discussed extensively earlier, the substantial investment, once protected articles have been shown, is in exploitation of the intellectual-property rights, "including engineering, research and development, or licensing." *Id.* We reject the respondents' proposed production-driven requirement, which is in conflict with the plain language of the statute and its legislative history.

---

[30] We note that this investigation involves only TPL's specifically identified articles. We recognize that future investigations may present questions regarding the existence of an article, *see, e.g., Certain Multiple-Beam Equalization Systems for Chest Radiography and Components Thereof*, Inv. No. 337-TA-326, Order No. 26, 1991 WL 788679, at *3 (Aug. 20, 1991) (discussing preparation of "a working model of the article practicing the patent claims" in connection with the investigation), and we do not reach such issues here. We also do not reach issues related to the analysis for industries in the "process of being established," *see generally Stringed Musical Instruments*, Comm'n Op., 2008 WL 2139143, at *10.

**5) Whether TPL Demonstrated the Existence of Domestic Industry Articles**

Having concluded that TPL must demonstrate the existence of protected articles practicing the asserted patents under subparagraphs (A), (B), and (C) of paragraph 337(a)(3), we turn to TPL's showings as to articles in this investigation, and we conclude that TPL failed to demonstrate the existence of articles practicing the asserted patents.

TPL attempted to establish the existence of a domestic industry based upon subparagraphs (A), (B), and (C) before the ALJ.[31] TPL's petition for review, however, raised only subparagraph (C), and within subparagraph (C) only licensing-related investment. In response to Question No. 1 of the notice of review, which asked whether articles are required under subparagraph (C), and if so, what they are, TPL maintained that no such showing is required, and therefore failed to identify any such articles in connection with its response to that question. TPL Br. 1-8. Nonetheless, TPL did attempt to show the existence of articles under subparagraphs (A) and (B) before the ALJ. The ALJ rejected TPL's showing in part because TPL had failed to brief its arguments adequately, in violation of the ALJ's Ground Rules. Question No. 3 in the notice asked whether TPL's technical-prong showing was uncontested, in which case, as discussed earlier, the Commission might excuse the lack of detailed briefing as to issues for which there was no genuine material dispute. *See, e.g., Certain Mobile Devices, Associated Software and Components Thereof,* Inv. No. 337-TA-744, Comm'n Op. 11-16 (May 18, 2012).

For the '623 patent, for which the ALJ found a violation of section 337, TPL relied before the ALJ upon its licensees' memory card readers, specifically the Lenovo H320-4041-

---

[31] TPL did not argue that there is a domestic industry in the process of being established, pursuant to 19 U.S.C. § 1337(a)(2). *See* TPL Post-Hearing Br. 267-289.

1JU and the Belkin PM00525-A. TPL's arguments are undisputed, and identical to the infringement dispute presented earlier. *See* TPL Br. 22; Resp'ts Br. 13. Based upon our claim construction of "accessible in parallel," TPL failed to demonstrate that these domestic industry products meet the "accessible in parallel" limitation of claim 1of the '623 patent. Accordingly, we find that TPL failed to demonstrate the existence of protected articles practicing the '623 patent, as is required for subparagraphs (A)-(C) of the domestic industry requirement.[32]

For the mapping patents, TPL relied on certain OnSpec products. In 2006, the original patent assignee, OnSpec Electronic, Inc. ("OnSpec"), assigned the asserted patents to MCM Portfolio LLC (formerly FMM Portfolio LLC). *See* CX-939C at Q/A 45-56. The complainant TPL received an exclusive license to assert the asserted patents and to collect royalties. *See, e.g., id.* OnSpec designed memory controllers, which it had third parties produce for OnSpec's customers. *See id.* at Q. 46. It is undisputed that in 2008, years prior to the complaint here, OnSpec ceased to exist, though TPL still sells a small number of OnSpec products designed prior to OnSpec's dissolution. CX-1084C (sales chart); CX-0941C at Q/A 23, 35, 55; CX-939C at Q/A 47-51; RX-2886C at Q/A 35-42, 45-46.

We affirm the ALJ's determination, and adopt his reasoning, that TPL cannot avail itself of OnSpec's investments (for all asserted patents, and as to all subparagraphs of section 337(a)(3)). ID at 155-157. Nonetheless, TPL could still have demonstrated the existence of a domestic industry by identifying protected articles that practice the mapping patents and by

---

[32] TPL's brief to the Commission only references the '549 patent once in passing. TPL Br. 21. We affirm the ALJ's determination that TPL's conclusory statements regarding the technical prong were insufficient to meet TPL's burden. ID at 135. We have affirmed the ID's determination of non-infringement, and therefore also affirm the ALJ's extension of that determination to TPL's domestic industry products, which operate in the same way as the accused products. ID at 135.

relying on TPL's own investments in the mapping patents, specifically TPL's investments in licensing.

We affirm the ALJ's application of his ground rules to find that TPL failed to demonstrate the existence of articles practicing the mapping patents. In their response to Question No. 3 in the notice of review, the respondents argue that whether TPL's domestic industry products practice the mapping patents was materially disputed, Resp'ts Br. 13, pointing repeatedly to a portion of their expert's witness statement. *Id.* (citing RX-2888C, Q/A 984-994). The respondents cited that portion in their post-hearing reply brief, where they challenged TPL's proof. Resp'ts Post-Hearing Reply Br. 95-96. TPL's discussion in its opening post-hearing brief was cursory, TPL Post-Hearing Br. 228-233, and we conclude that the ALJ did not abuse his discretion to conclude that TPL's arguments were too scant to carry TPL's burden to demonstrate the existence of articles practicing the mapping patents. We note that TPL tried to cure this defect in its post-hearing reply brief, TPL Post-Hearing Reply Br. 45-49, but agree with the ALJ that this showing was untimely, ID at 137-138. In response to the Commission notice, TPL pointed to little to demonstrate that domestic industry articles practice the mapping patents beyond the same statements from its reply post-hearing brief that the ALJ found inadequate. TPL Br. 21-23. Because TPL did not demonstrate the existence of articles practicing the mapping patents, it cannot demonstrate the existence of a domestic industry.[33]

---

[33] We therefore do not reach whether the economic prong would have been met if articles had been shown.

## IV.    CONCLUSION

For the foregoing reasons, we find that TPL failed to demonstrate that the accused products infringe and that domestic-industry articles practice, the asserted patents. The existence of articles is, in view of recent Federal Circuit authority, a requirement for demonstrating the existence of a domestic industry. The Commission terminates this investigation with a finding of no violation of section 337.

By order of the Commission.

Lisa R. Barton

Acting Secretary to the Commission

January 9, 2014

## DISSENTING VIEWS OF COMMISSIONER SHARA L. ARANOFF

I find that, in an investigation asserting a domestic industry based on licensing under 19 U.S.C. § 1337(a)(3)(C), the complainant is not required to prove the existence of "articles" protected by the relevant patent or other intellectual property right. I believe this interpretation of the statute is supported by the language and legislative history of the 1988 amendments to section 337, consistent with nearly 25 years of agency practice, and consistent with the Court of Appeals for the Federal Circuit's ("Federal Circuit") holdings in *InterDigital I* and *II*. The interpretation adopted by the Commission leads to the very same unjust results that led Congress to amend section 337's domestic industry requirement in 1988 to add the licensing provision. Accordingly, I dissent from the Commission's finding that complainant Technology Properties Limited LLC ("TPL") was required to establish the "technical prong" of the domestic industry requirement in order to show a domestic industry based on licensing activities under section 337(a)(3)(C).[1]

### Statutory Language

The domestic industry requirement is described in section 337(a)(2) and (a)(3). Those provisions provide as follows:

(2) Subparagraphs (B), (C), (D), and (E) of paragraph (1) apply only if an industry in the United States, relating to the articles protected by the patent, copyright, trademark, mask work, or design concerned, exists or is in the process of being established.

(3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—

(A) significant investment in plant and equipment;

(B) significant employment of labor or capital; or

(C) substantial investment in its exploitation, including engineering, research and development, or licensing.

---

[1] TPL attempts to establish an engineering and research and development domestic industry case under section 337(a)(3)(C) by relying on the investments of OnSpec Electronic, Inc. ("OnSpec"). I agree with the Commission that TPL cannot rely on OnSpec's investments and consequently cannot establish engineering and research and development industries. Therefore, I do not reach the question of whether there is a statutory requirement that a complainant demonstrate the existence of articles practicing the asserted patents for engineering and research and development industries under section 337(a)(3)(C).

To properly answer the question of whether the "licensing" language of section 337(a)(3)(C) requires that a complainant prove the existence of "articles" protected by the relevant patent or other intellectual property right in order to establish a licensing-based industry, the statutory language must be considered in context of the purpose for which it was adopted. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve."); *Candle Corp. of America v. Int'l Trade Comm'n*, 374 F.3d 1087, 1093-94 (Fed. Cir. 2004) ("[W]here textual ambiguity exists, we must look beyond the bare text . . . to the context in which it was enacted and the purposes it was designed to accomplish."). Any understanding of the statutory language must also be guided by Commission precedent. Accordingly, I describe the legislative history that gave rise to the licensing provision of section 337(a)(3)(C) and the Commission precedent that has interpreted the provision.

The Domestic Industry Requirement and the 1988 Amendments to Section 337

Section 337 was passed into law by the Tariff Act of 1930, but its origins date back to section 316 of the Tariff Act of 1922. Congress saw section 316 as a trade remedy directed at "unfair methods of competition and unfair acts in the importation of articles" that were not addressed by the newly-minted Anti-Dumping Act of 1916. It was not until 1930 that a divided panel of the U.S. Court of Customs and Patent Appeals ruled that section 316 could apply to patent infringement. *Frischer & Co., Inc. v. Bakelite Corp.*, 39 F.2d 247 (CCPA 1930).

Like other trade remedies, Congress intended section 337 to protect American industries and American workers. Thus, section 316 provided that: "unfair methods of competition and unfair acts in the importation of articles into the United States . . . the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful." Tariff Act of 1922, Pub. L. No. 67-318, § 316(a), 42 Stat. 858, 943-44 (1922); *see also* S. Rep. No. 67-595, 2d Session, at 3 (1922) ("The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had."); *compare with* 19 U.S.C. §§ 1677(4), (7) (defining domestic industry and material injury in the Title VII context), and 19 U.S.C. § 2252 (section 201).

While the statutory language has been amended a number of times since 1922, one basic premise has remained the same: the imposition of relief under section 337 is contingent upon the existence of a domestic industry and not merely upon ownership of a valid and infringed U.S. patent or other intellectual property right. *See John Mezzalingua Assocs. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1327-28 (Fed. Cir. 2011); S. Rep. No. 100-71, at 129 (1987); H.R. Rep. No.100-40, Pt. 1, at 157 (1987).

Prior to 1988, the statute provided that:

> Unfair methods of competition and unfair acts in the importation of
> articles into the United States, or in their sale by the owner, importer,
> consignee, or agent of either, the effect or tendency of which is to destroy
> or substantially injure and industry, efficiently and economically operated,
> in the United States, or to prevent the establishment of such an industry, or
> to restrain or monopolize trade and commerce in the United States, are
> declared unlawful . . . .

19 U.S.C. § 1337(a) (1982).[2]

The Commission interpreted this pre-1988 statutory language to require evidence of manufacturing in the United States to satisfy the domestic industry requirement. For example, In *Certain Miniature, Battery-Operated, All-Terrain, Wheeled Vehicles*, Inv. No. 337-TA-122, complainants alleged patent infringement and false designation of origin by certain imported toy trucks. In that investigation, complainants' own STOMPER toy vehicles were manufactured under license by an unrelated company in Hong Kong. Complainant Goldfarb's U.S. activities consisted of designing and licensing toy truck designs to toy manufacturers. Complainant Schaper's U.S. activities consisted of further developing Goldfarb's designs into a complete engineering model, engineering drawings, and tooling for the manufacture of each toy truck design. Upon importation of the toy trucks manufactured, packaged and inspected in Hong Kong, Schaper performed some minor packaging and quality control operations in the United States, along with promotion, advertising and marketing activities.

While the ALJ found that complainants' activities established the existence of a domestic industry, the Commission reversed. The Commission reasoned that "the essence of Goldfarb's business in this case is licensing and the concomitant collection of royalties" and that "[d]efining 'industry' as the mere ownership or licensing of patent rights would be contrary to Commission precedent, legislative history, and the logical construction of the statute's wording." Opinion of Chairman Eckes, Commissioner Stern and Commissioner Haggart at 8 (Oct. 1982). The Commission found that Schaper's U.S. activities were both too minor and too unrelated to production to count toward establishment of a domestic industry. *Id.* at 9-11. On appeal, the Federal Circuit affirmed the Commission's finding of no domestic industry, holding that the "patent must be exploited by production in the United States". *Schaper Mfg. Co. v. Int'l Trade Comm'n*, 717 F.2d 1368, 1371 (Fed. Cir. 1983) ("There is nothing in the statute or its legislative

---

[2]     The legislative history of the Trade Act of 1974 provides: "In cases involving the claims of U.S. patents, the patent must be exploited by production in the United States, and the industry in the United States generally consists of the domestic operations of the patent owner, his assignees and licensees devoted to such exploitation of the patent." H.R. Rep. No. 93-571, at 78 (1973).

history to indicate that such activities, which do not involve either manufacture or production or servicing of the patented item, are meant to be protected by section 337.").[3]

The Commission reached a similar result in *Certain Products with Gremlins Character Depictions*, Inv. No. 337-TA-201. In that case, complainant Warner Brothers alleged infringement of three copyrights by certain souvenir items related to its popular *Gremlins* feature film. Warner Brothers claimed the existence of a domestic industry exploiting the relevant copyrights through its marketing, financial, and legal activities related to the licensing of the Gremlins copyrights. Warner Brothers' own copyrighted souvenir items were manufactured by licensees both inside and outside the United States, but Warner Brothers did not offer evidence of its licensees' domestic production activities in support of its domestic industry claim. While conceding that Warner Brothers' licensing activities were more substantial in monetary terms than those involved in *Toy Vehicles*, the Commission stated that "[p]roduction-related activities distinguish a domestic industry from an importer or inventor. It is clear from section 337, its legislative history, past Commission decisions, and Schaper that section 337 protects domestic industries, not importers or inventors." Comm'n Op., 1986 ITC LEXIS 313, at *163 (Mar. 1986). The Commission concluded: "Because [Warner Brothers'] activities relate solely to the servicing of the intellectual property rights in question and are not the type of activities that Congress intended to protect by section 337, we reverse the ALJ on this issue." *Id.* at *171.[4]

It was against this background that intellectual property owners began to lobby Congress for changes to section 337's domestic industry requirement that would permit certain non-manufacturing entities to obtain relief from infringing imports. Congress requested that the General Accounting Office prepare a study, which analyzed the extent to which the Commission was finding no violation of section 337 based on a complainant's failure to show domestic manufacturing. *See* GAO Report to Selected Congressional Subcommittees, *International Trade: Strengthening Trade Law Protection of Intellectual Property Rights*, NSIAD-86-150 (Aug. 13, 1986). Industry associations weighed-in in support of expanding the domestic industry definition to encompass non-manufacturing activities like licensing and research and development. *See, e.g., Intellectual Property Rights: Hearings before the Subcomm. on Int'l*

---

[3] The Federal Circuit made clear that it was not precluding the possibility that a complainant's non-production (and non-licensing) domestic activities might (unlike Schaper's) be great enough in some future case to establish a domestic industry. "As the statute now stands, Congress did not mean to protect American importers (like Schaper) who cause the imported item to be produced for them abroad and engage in relatively small nonpromotional and non-financing activities in this country." 717 F.2d at 1373. The Federal Circuit also noted that: "If, as appellants suggest, present-day 'economic realities' call for a broader definition to protect American interests (apparently including many of today's importers) it is for Congress, not the courts or the Commission, to legislate that policy." *Id.*

[4] In her dissent, Vice Chairman Liebeler argued that the plain language of section 337 did not require evidence of manufacturing to establish a domestic industry, but left room for consideration of any domestic economic activity by complainant that adds economic value to an intellectual property right. Chairman Liebeler opined that domestic "service" activities, such as licensing, should be sufficient to establish a domestic industry, but that non-domestic activities (i.e. foreign manufacturing) should not. *See* Dissenting Views of Vice Chairman Liebeler, 1986 ITC LEXIS 313, at *204-220.

Megan Rae Whyman Olesek (Bar No. 191218)
KENYON & KENYON LLP
1801 Page Mill Road, Suite 120
Palo Alto, CA 94304-1216
Telephone: (650) 384-4701
Facsimile: (650) 384-4701
Email: molesek@kenyon.com

T. Cy Walker (admitted Pro Hac Vice)
KENYON & KENYON LLP
1500 K Street, NW, Suite 700
Washington, DC 20005
Telephone: 202-220-4200
Facsimile: 202-220-4201
Email: cwalker@kenyon.com

Marcia H. Sundeen (admitted Pro Hac Vice)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
Email: msundeen@goodwinprocter.com
*ATTORNEYS FOR DEFENDANTS*
*HEWLETT-PACKARD COMPANY.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| TECHNOLOGY PROPERTIES LIMITED LLC, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> HEWLETT-PACKARD COMPANY, <br> Defendant. | Civil Action No. 4:14-cv-03643-CW <br><br> **[PROPOSED] ORDER GRANTING MOTION OF DEFENDANTS' FOR JUDGMENT ON THE PLEADINGS** |
| TECHNOLOGY PROPERTIES LIMITED LLC and MCM PORTFOLIO LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CANON INC., et al., <br><br> Defendants. | Civil Action No. 14-03640 CW <br><br> **[PROPOSED] ORDER GRANTING MOTION OF DEFENDANTS' FOR JUDGMENT ON THE PLEADINGS** |

| | |
|---|---|
| TECHNOLOGY PROPERTIES LIMITED LLC, et al., | Civil Action No. 4:14-cv-03643-CW |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING MOTION OF DEFENDANTS' FOR JUDGMENT ON THE PLEADINGS** |
| vs. | |
| NEWEGG INC. et al., Defendant. | |
| TECHNOLOGY PROPERTIES LIMITED LLC and MCM PORTFOLIO LLC, | Civil Action No. 14-03646 CW |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING MOTION OF DEFENDANTS' FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| SEIKO EPSON CORPORATION, et al., | |
| Defendants. | |

On June 18, 2015, Defendants Hewlett-Packard Company, Canon Inc., Canon U.S.A., Inc., Newegg Inc, Rosewill Inc., Seiko Epson Corporation, and Epson America, Inc. (collectively "Defendants") Motion for Judgment on the Pleadings came on for hearing before this Court. All parties were given notice and an opportunity to be heard.

Having considered all papers filed in support of and in opposition to the motion and the arguments of counsel at the hearing, and GOOD CAUSE APPEARING,

IT IS HEREBY ORDERED that Defendants' Motion for Judgment on the Pleadings is GRANTED.

Dated: _____ ___, 2015

_____

Case No. 4:14-cv-03643-CW

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that, on May 1, 2015, I caused the foregoing document to be served on

3

counsel of record via the Court's CM/ECF system.

4

5

Dated:  May 1, 2015

6

7

                    By */s/Gordon M. Fauth*_____
                        Gordon M. Fauth

8

                        Attorney for Defendant Hewlett-Packard Company

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28